# EXHIBIT 2
Deposition of Justin Wonch

1           IN THE UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MICHIGAN
2                 NORTHERN DIVISION

3  RICHARD J. HILL,            )
                          )
4      Plaintiff,       )  Case No. 2:19-cv-159-JTN-MV
                          )
5  vs.                  )  U.S. District Judge:
                          )  Hon. Janet T. Neff
6  JUSTIN WONCH and       )
    TOWNSHIP OF FORSYTH,    )  U.S. Magistrate Judge:
7                       )  Hon. Maarten Vermaat
      Defendants.      )
8  _____)

9                DEPOSITION OF JUSTIN WONCH

10     Taken on the part of the Plaintiff, at the offices of
Kitch, Drutchas, Wagner, Valitutti & Sherbrook, P.C.,
11  1440 West Ridge Street, Marquette, Michigan, on Wednesday,
September 29, 2021, at about 1:03 p.m.
12
13  APPEARANCES:

14      For the Plaintiff:  Mr. Phillip B. Toutant (P72992)
                      Numinen, DeForge & Toutant, P.C.
                      105 Meeske Avenue
15                    Marquette, MI 49855
                      (906)226-2580
16                    phillip@numinenlaw.com

17      For the Defendants: Mr. M. Sean Fosmire (P31737)
                      Kitch, Drutchas, Wagner, Valitutti
18                     & Sherbrook, P.C.
                      1440 West Ridge Street
19                    Marquette, MI 49855
                      (906)228-0001
20
      Videographer:  Tony Beres
21
      Also in attendance: Abbie Swidorski
22

23      Reported by:    Sandra A. Larson, CSR-2916, RMR
                      NORTHERN REPORTERS
24                    P.O. Box 27
                      Marquette, Michigan 49855
25                    (906)226-2706
                      northernreporters@yahoo.com

```
1                          TABLE OF CONTENTS

2    JUSTIN WONCH

3         Examination by Mr. Toutant . . . . . . . . . . . . .  4
          Examination by Mr. Fosmire . . . . . . . . . . . . 86
4

5    EXHIBITS                                          IDENTIFIED

6         Plaintiff's Exhibit No. 1 - Communications Event
                Report dated 3-22-19. . . . . . . . . . . . . 32
7         Plaintiff's Exhibit No. 2 - Marquette County Jail
                Inmate Intake Form. . . . . . . . . . . . . . 61
8         Plaintiff's Exhibit No. 3 - Forsyth Police
                Department Case report. . . . . . . . . . . . 74
9         Plaintiff's Exhibit No. 4 - printout from Forsyth
                Township Police Department website. . . . . . 80
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Marquette, Michigan

 2              Wednesday, September 29, 2021 - 1:03 p.m.

 3              THE VIDEOGRAPHER:  We are on the record in

 4       Marquette, Michigan, for the video deposition of

 5       Officer Justin Wonch, in the matter of Richard J. Hill,

 6       plaintiff, versus Justin Wonch and the Township of

 7       Forsyth, defendants.  This is a matter currently

 8       pending in the United States District Court, Western

 9       District of Michigan, Northern Division, Case No.

10       2:19-cv-159-JTN-MV.  Today's date is Wednesday,

11       September 29th, 2021, and the time is approximately

12       1:04 p.m.  I am Tony Beres, video operator for La Dolce

13       Video.

14              Counsel, if you would put your appearances on

15       the record, the court reporter will then state her name

16       and swear the witness.

17              MR. TOUTANT:  Phil Toutant appearing on

18       behalf of Jack Hill.

19              MR. FOSMIRE:  Sean Fosmire here on behalf of

20       the defendants.

21              THE REPORTER:  Sandy Larson from Northern

22       Reporters.

23              Would you raise your right hand, please.  Do

24       you swear or affirm the testimony you are about to give

25       will be the truth, the whole truth, and nothing but the
```

1     truth?

2             OFFICER WONCH:  I do.

3             THE REPORTER:  Thank you.

4             MR. TOUTANT:  The record should reflect that

5     this is the deposition of Justin Wonch, taken pursuant

6     to notice and agreement of counsel as to time and

7     place.  This deposition is to be used for any and all

8     purposes, including use at trial, pursuant to Federal

9     Rule of Civil Procedure 32.

10                    JUSTIN WONCH

11    having been first duly sworn, was examined and

12    testified as follows:

13                  EXAMINATION

14  Q   Mr. Wonch, can you please state your name for the

15     record?

16  A   Justin Wonch.

17  Q   Have you ever given a deposition before?

18  A   No.

19  Q   Have you ever testified at trial before?

20  A   Yes.

21  Q   On how many occasions?

22  A   Unknown.

23  Q   More than ten, less than ten?

24  A   Unknown.

25  Q   Okay.  Well, given that, I will briefly go through the

1    ground rules applicable to a deposition, which is quite

2    a bit like testifying at trial.  In other words, we are

3    making a written record here today, so what I would

4    like you to do is be sure to give a verbal response.

5    So refrain from responding to questions with a nod or a

6    shake of the head.  Be sure to give a verbal response.

7    Also, avoid using um-h'm or huh-uh.

8         If I ask a question that you don't

9    understand, by all means, ask me to clarify.  I will

10   attempt to do so.  If I ask a question that you don't

11   understand, and you don't ask for clarification, and

12   answer, I am going to presume that you understood the

13   question and answered knowingly.  Is that fair?

14   A  Yes.

15   Q  I don't know how long exactly we will be going here

16      today, but this is not an endurance competition.  If at

17      any point you would like to take a break, just let us

18      know, and we can go off the record, you can take a

19      break.  The one exception to that rule is that if there

20      is a question pending, you have to answer the pending

21      question before going off the record and taking a

22      break.

23         I am going to start out by asking you some

24      questions about your background and training.  You were

25      born on April 14th, 1980; correct?

```
 1  A    Yes.

 2  Q    Would that make you 41 years old?

 3  A    Yes.

 4  Q    We are here today about an incident that occurred on

 5       March 22nd of 2019.  At that point, you would have been

 6       38?

 7  A    Sure.  I don't --

 8  Q    I mean --

 9  A    Forty-one -- I think so, yeah.

10            MR. FOSMIRE:  It was March; right?

11            THE WITNESS:  March, yeah.

12  BY MR. TOUTANT:

13  Q    In your answers to interrogatories, you said that your

14       weight was 270 pounds, when you were answering the

15       interrogatories, which of course is after this case was

16       filed.  Was your weight approximately the same on or

17       about March 22nd of 2019?

18  A    Probably somewhere between 250 to 260.

19  Q    You are six foot, two inches?

20  A    Correct.

21  Q    You graduated from Gwinn High School in 1998?

22  A    Yes.

23  Q    Do you have any relatives in the U.P. who don't have

24       your last name?

25  A    No.  Well, sorry, change that.  My grandmother's last
```

```
 1        name -- I -- Are you talking about like brothers,

 2        sisters, or are you talking about like every family

 3        member I have?

 4   Q    Any, yeah.

 5   A    Yeah.  There is Johnson, Koskela, Heikkinen.  I mean

 6        those are the main ones.

 7   Q    Any others?

 8   A    Smith.  I think that's it.

 9   Q    Do you have any children?

10   A    One.

11   Q    How old?

12   A    Eleven.

13   Q    What's your child's mother's name?

14   A    Kristi Bell.

15   Q    Is she local?

16   A    Yes.

17   Q    Did you have any jobs before you graduated high school?

18   A    Yes.

19   Q    What were those?

20   A    I worked at Red Lobster, and I worked at Mussato's IGA.

21   Q    Where is Mussato's IGA?

22   A    It was in Gwinn.

23   Q    Is it closed now?

24   A    Yes.

25   Q    Did you hold any jobs between graduating from high
```

| | | |
|---|---|---|
| 1 | | school and going to Northern? |
| 2 | A | I believe it would have been the same jobs, between |
| 3 | | high school and Northern. |
| 4 | Q | So both Red Lobster and Mussato's IGA? |
| 5 | A | Correct. |
| 6 | Q | No others? |
| 7 | A | You are talking just between high school and Northern? |
| 8 | Q | Correct. |
| 9 | A | No others that I know of, that I can remember. |
| 10 | Q | You are in the National Guard? |
| 11 | A | Yes. |
| 12 | Q | Did you enlist directly in the National Guard, or did |
| 13 | | you have any other service before National Guard duty? |
| 14 | A | Just the National Guard. |
| 15 | Q | What was your role in the National Guard? |
| 16 | A | Small arms repairman. |
| 17 | Q | So gunsmithing, essentially? |
| 18 | A | Yes. |
| 19 | Q | Any other roles while you were in the National Guard? |
| 20 | A | No. |
| 21 | Q | What was your rank? |
| 22 | A | E-4 specialist. |
| 23 | Q | Did you have any deployments, foreign or otherwise? |
| 24 | A | No. |
| 25 | Q | While you were in the military, did you receive any |

```
 1         police training or military -- or do any military

 2         police work?

 3    A    No.

 4    Q    What was the name of your commanding officer?

 5    A    I don't recall.

 6    Q    So while you were at Northern and in the National

 7         Guard, did you have any other jobs?

 8    A    I worked as a sub custodian in the winter, at Marquette

 9         Area Public Schools.

10    Q    Anything else?

11    A    I was a mason's apprentice during the summers.

12    Q    For who?

13    A    Gary Rasanen, deceased.

14    Q    Anything else?

15    A    No, not that I recall.

16    Q    What were your work obligations while you were in the

17         National Guard and attending Northern Michigan

18         University?

19    A    Do you want to know about just the National Guard, or

20         do you want to know about masonry, or do you want to

21         know about sub custodial?

22    Q    I guess, why don't we break it down and do all three?

23    A    Sure.  National Guard was drill one weekend a month.

24         We had a two-week annual training, usually held in

25         Grayling.  Weekend obligations for the one weekend a
```

```
 1      month was basically maintenance of weapons, assist

 2      other soldiers on maintenance of vehicles.  They call

 3      it PNCS.  That was, I mean, the basic gist of it.

 4      During my two weeks a year, I was in charge of the

 5      weapons for our annual training, and then in charge of

 6      inspecting weapons when turned in, in charge of ammo

 7      distribution and keeping count of ammo.  That's

 8      basically what my entire -- entire Army career was --

 9      National Guard career.

10  Q   So it wasn't a full-time operation?

11  A   No, one weekend a month, two weeks a year.

12  Q   Okay.

13          MR. FOSMIRE:  Excuse me, give me just 20

14      seconds.

15          MR. TOUTANT:  Your mic.

16          MR. FOSMIRE:  I will be right back.

17          MR. TOUTANT:  Do we need to go off the

18      record, Sean?

19          MR. FOSMIRE:  I don't think so.

20          MR. TOUTANT:  We will just wait.

21          MR. FOSMIRE:  Thank you.

22  BY MR. TOUTANT:

23  Q   What about the custodial work at Marquette Area Public

24      Schools, what was your workload for that?

25  A   I was just a substitute custodian.  So when custodians
```

```
 1        would take the day off or if they were out for an

 2        extended period of time, I would just fill their

 3        shifts.  I -- It was just basic cleaning of the

 4        schools, vacuuming, mopping, cleaning the bathrooms,

 5        all of your basic custodial things.  I didn't repair

 6        anything, nothing like that.  It was just cleaning.

 7   Q    And then how many hours a week, approximately?

 8   A    It was variable, just depending on when people were off

 9        of work or whatever.  So sometimes I would have --

10        basically be working 40 hours a week, and sometimes I

11        wouldn't work a shift in a week.

12   Q    The 40 hours a week was probably not that common,

13        basically when someone had a vacation or something like

14        that?

15   A    Yeah.  Or if somebody was out on an injury, you know, I

16        could work for three months at full-time, so it just --

17        it was very variable throughout my entire time working

18        for them.

19   Q    Then the summer mason's apprentice job, was that a

20        full-time thing or no?

21   A    Yes, during the summers.

22   Q    What year did you graduate from Northern Michigan?

23   A    I am not 100 percent sure.  I think I put it on that

24        sheet you had me fill out.  I can't recall.  I am

25        horrible with dates, so I can't remember what date it
```

```
 1      was.

 2  Q   Does 2008 sound right?

 3  A   Yes, that would be probably correct.

 4  Q   So you were at Northern Michigan University from 2002

 5      to 2008?

 6  A   That sounds correct.

 7  Q   At some point you were employed by the Marquette County

 8      jail?

 9  A   Correct.

10  Q   Was that after you completed the police academy?

11  A   No, before.

12  Q   Then after you were at the jail, you started at the

13      Forsyth Township Police Department; is that correct?

14  A   Yes, after completing the police academy.

15  Q   And you were there essentially continuously, with a

16      couple of exceptions, until present; is that accurate?

17  A   Yes.  At Forsyth, yes.

18  Q   Forsyth Township Police Department is full-time?

19  A   Yes, and I worked part-time there, too.

20  Q   How was that decided between part-time and full-time?

21  A   When I was working for DHS, for CPS, I was able to keep

22      my certification.  We had -- We were able to work the

23      airport at the time, so I worked part-time while

24      working full-time for CPS.  So I kept my certification

25      through Forsyth by working the airport.
```

```
1   Q    I see.  So when you were with D -- the State of
2        Michigan, Department of Health and Human Services,
3        slash, Child Protective Services, from -- was that from
4        April of 2015 until June of 2016?
5   A    It's pretty close, yes.
6   Q    And so you left full-time employment with Forsyth
7        Township to go to that job; is that true?
8   A    Yes.
9   Q    And then continued to work part-time during that period
10       --
11  A    Yes.
12  Q    -- correct?  Yes?
13  A    Yes.
14  Q    And then after you left CPS, you went back full-time at
15       Forsyth Township?
16  A    Yes.
17  Q    Why did you leave CPS?
18  A    I just wanted to go back to police work.
19  Q    And you were a patrol officer, that was your title?
20  A    Yes.
21  Q    So from 2009 to April of 2019, you were a patrol
22       officer; correct, with Forsyth Township Police
23       Department?
24  A    From 2009 till when?
25  Q    April of 2019.
```

```
 1              MR. FOSMIRE:  I think he only wants to ask

 2         about up to the date of this incident.

 3              THE WITNESS:  Oh, okay.

 4    A    Sure.  Yes.

 5    Q    And then after April of 2019, you were not employed by

 6         the Forsyth Township Police Department; correct?

 7    A    Correct.

 8    Q    Then you rejoined the Forsyth Township Police

 9         Department in September of 2019; is that correct?

10    A    Correct.

11    Q    Why did you leave the Forsyth Township Police

12         Department in April of 2019?

13    A    I was pursuing a different job.

14    Q    Where?

15    A    Louisiana.

16    Q    What was that job?

17    A    It was working for oil refineries.

18    Q    In what role?

19    A    I didn't get -- I didn't have the job, so I am not

20         100 percent.

21    Q    So did you move to Louisiana?

22    A    I was down in Louisiana for a while, yeah.

23    Q    Without a job?

24    A    Correct.

25    Q    Why did you make the decision to move to Louisiana?
```

```
 1   A    I have family there.
 2   Q    So you were trying to get a job at a refinery in
 3        Louisiana, but you were unable to do so; is that
 4        correct?
 5   A    Correct.
 6   Q    Is that the reason why you returned to the U.P., or is
 7        there something else?
 8   A    No.  I came back for personal reasons.  So I was never
 9        employed between those two spots.  That's why I didn't
10        list it as anything employed between those two spots.
11   Q    And then you returned to Forsyth Township in September
12        of 2019?
13   A    Yes.
14   Q    And you were given the same position?
15   A    Yes.
16   Q    In March, April of 2019, who was the chief of the
17        Forsyth Township Police Department?
18   A    It would have been -- His last name is Fitzgerald.
19   Q    What was his first name?
20   A    I am not sure.  Oh, wait.  Are you -- Is this after I
21        returned from Louisiana?
22   Q    No, this is before you left, spring of 2019.
23   A    Okay.  Yep.  That would have been Fitzgerald.  I don't
24        recall his first name.  He wasn't there very long.
25   Q    Where was he from?
```

```
 1   A    Downstate I think.

 2   Q    What happened to him?

 3   A    He was -- He resigned.

 4   Q    Why did he resign?

 5   A    I don't have that information.

 6   Q    How long was he there?

 7   A    I don't know.  I am not 100 percent sure, maybe six

 8        months.

 9   Q    When did he resign, do you know?

10   A    I don't.

11   Q    Were you employed there when he resigned?

12   A    I don't -- I don't believe so.

13   Q    So it would have been in the time period while you were

14        in Louisiana that he resigned, do you think?

15   A    I believe so.

16   Q    So when you returned, who was the chief?

17   A    Detective Sergeant Kjellin was the acting chief when I

18        came back.

19   Q    In December of 2019, you started working for the

20        Keweenaw Bay Indian Community Tribal Police; is that

21        true?

22   A    Yes.

23   Q    Do you still do that?

24   A    Yes.

25   Q    What are your duties there?
```

```
 1   A    Just a police officer for the tribal police.

 2   Q    How often do you do that?

 3   A    Hours are variable, depending on my schedule with

 4        Forsyth.  I just work around my schedule at Forsyth.

 5   Q    On average, how many hours a week do you work at the

 6        Keweenaw Bay Indian Community?

 7   A    Estimated maybe 20 hours a week.

 8   Q    What's your number of hours per week on average with

 9        Forsyth Township?

10   A    It is 80.5 hours every two weeks, every pay period.

11   Q    So 40.25 --

12   A    Sure.

13   Q    -- per week?

14   A    It is -- Because the schedule is split up weird, we

15        work more in one week than we do in the other week.

16        That's why we just break it down into a two-week.

17   Q    So what you are saying it is not split down the middle?

18   A    Correct.

19   Q    It is not like 40 hours one week, 40 the next, you

20        might work 30 hours one week and 50 hours --

21   A    Correct.

22   Q    -- the next?

23   A    Exactly.

24   Q    Okay.  But it adds up to a total of 80.5 hours over a

25        two-week period?
```

```
 1  A    Yes.

 2  Q    What's your normal shift with Forsyth Township, if you

 3       have one?

 4  A    Nights.

 5  Q    What are those hours?

 6  A    Six-thirty p.m. to six o'clock a.m.

 7  Q    Chief Fitzgerald, when he left, where did he go?

 8  A    I don't know.

 9  Q    Do you know where he came from downstate?

10  A    I don't know.

11  Q    At Keweenaw Bay Indian Community Tribal Police, what

12       are your hours there?  I mean, I know you said that

13       they were, you know, kind of around your hours with

14       Forsyth Township, but are they night shift hours, day

15       shift?  What's -- What's the breakdown?

16  A    Just whenever I want to work.

17  Q    Do you have a partner there?

18  A    No.

19  Q    What's your rank with Forsyth Township?

20  A    Patrol officer.

21  Q    And that's the rank you have held since you started?

22  A    Correct.

23  Q    Have you ever been convicted of a crime?

24  A    No.

25  Q    Received any citations?
```

```
 1    A    Yes.

 2    Q    What for?

 3    A    I was involved in a traffic accident in a construction

 4         zone when I was like 17 years old.

 5    Q    And you received a citation for that?

 6    A    Yeah.  I think it was driving too fast for conditions

 7         or following too close, something.  I don't recall what

 8         it was.  But, yes, I did receive a citation.

 9    Q    Other than this, have you ever been a party to a

10         lawsuit?

11    A    No.

12    Q    Who was Cavalry SPC 1 LLC?

13    A    Oh, that would be a -- what are they called, credit --

14    Q    Debt collector?

15    A    Debt collector.  So I guess that would make sense.

16    Q    They have sued you; right?

17    A    Not that I know of.

18    Q    So what's their -- What's your involvement Cavalry 1

19         SPC, the debt collector?

20    A    I don't have any involvement with them.

21    Q    So you just said that makes sense.

22    A    Well, it is a debt collector.  You just listed a debt

23         collector, and then you asked me if they sued me, and I

24         told you, I don't believe so.

25    Q    Okay.
```

```
1   A   So --

2   Q   But you have some involvement with them, they have

3       contacted you?

4   A   Yes.

5   Q   What about?

6   A   Debt.

7   Q   What debt?

8   A   It would have been a credit card debt.

9   Q   Were you able to work that out?

10  A   Are you asking if I worked it out with them?

11  Q   Yes.

12  A   I did not work it out with them, but the debt is no

13      longer there.

14  Q   Okay.  Did you pay it off?

15  A   I did not pay it off.

16  Q   You filed a bankruptcy?

17  A   I did not.

18  Q   What happened to the debt?

19  A   I don't know.  They are -- It is not there.  I don't

20      know.

21  Q   When did that happen, when did that go away?

22  A   I don't recall.

23  Q   How much did they allege you owed?

24  A   I don't know.

25  Q   In terms of your training, what are the training
```

```
 1        requirements you have with Forsyth Township Police
 2        Department?
 3    A   I don't understand what you are asking.
 4    Q   What requirements do you have for training, continuing
 5        training, as a member of Forsyth Township Police
 6        Department?
 7    A   As of right now, we have to do a yearly update, a legal
 8        update.
 9    Q   What's that?  Tell me about it.
10    A   Just an update with the prosecutor's office, where they
11        tell you about new laws that affect your job.
12    Q   Any other training?
13    A   That's required?
14    Q   Correct.
15    A   Just firearms training.
16    Q   Is that qualification?
17    A   Yes.
18    Q   So for required training, you have got an annual legal
19        update with the prosecutor's office; correct?
20    A   Correct.
21    Q   And then also an annual firearms qualification?
22    A   Yes.
23    Q   Anything else?
24    A   No, that's required yearly.  Those are the only two
25        that are required yearly.
```

```
1   Q   What about other training requirements that may not be
2       yearly, maybe on a different cycle?
3   A   Sure.  You are supposed to update, refresh on taser, I
4       believe it is every two years, and PPCT every two
5       years -- or three years, I don't recall which it is.
6   Q   PPCT, what's that?
7   A   Defensive tactics training.
8   Q   Any other required training?
9   A   Oh, radar training, and I don't recall the time frames
10      on that, and SFST training updates.  Those are all
11      updates every two or three years.
12  Q   SFST stands for Standard Field Sobriety Tests?
13  A   Yes.
14  Q   Any other required trainings?
15  A   Not that I can think of off the top of my head.
16  Q   Are there any trainings that you have done voluntarily?
17  A   Yes.
18  Q   What are those?
19  A   I did forensic interviewing training.
20  Q   Is that something you did when you worked for CPS?
21  A   I did for both CPS and for Forsyth Township Police
22      Department.
23  Q   Anything else?
24  A   Not that I can recall off the top of my head.
25              THE WITNESS:  Can I use the restroom?
```

```
 1              MR. TOUTANT:  Sure.  We can go off the
 2        record.
 3              THE VIDEOGRAPHER:  Let me get off the record.
 4        One second.  We are going off the record, and the time
 5        is 1:39 p.m.
 6              (Off the record.)
 7              THE VIDEOGRAPHER:  We are back on the record,
 8        and the time is 1:41 p.m.
 9   BY MR. TOUTANT:
10   Q    I am going to ask you some questions about your work in
11        your department at Forsyth Township, back in late March
12        of 2019.  At that time, how many officers were on the
13        force?
14   A    I don't recall.
15   Q    You don't have an approximate idea?
16   A    I don't.
17   Q    How many officers are presently on the force?
18   A    Seven including the chief, I think.
19   Q    Between 2019 and now, has there been any significant
20        changes in that number of officers?
21   A    There has been multiple openings and vacancies, and so
22        that's why I couldn't give you -- it is either between
23        five and seven probably at that time I would guess --
24        or five and eight.  I think eight we are fully staffed,
25        with the chief, but I know it has been as low as five.
```

1  Q    I see.  So somewhere between five and eight, you are

 2       not sure?

 3  A    Right.

 4  Q    Okay.  How many officers would have been on duty at

 5       nine on a Friday night?

 6  A    On a regular Friday night?

 7  Q    In late March of 2019.

 8  A    It just depends on the schedule, I -- or depends on if

 9       anybody had vacation or anything like that.

10  Q    So you don't know?

11  A    You are asking me a question that I can't have an

12       answer to.

13  Q    Well, yeah, that's what I mean, you don't know, because

14       you don't know --

15  A    The scheduling, yeah.  It just depends on the

16       scheduling.

17  Q    So generally speaking, how many officers are on at

18       around nine on a Friday night?

19  A    Two.

20  Q    That's generally the case?

21  A    Yes.

22  Q    Would you say it is the routine normally?

23  A    Yes.

24  Q    Are those two officers separate or together?

25  A    You can -- We usually either double at the beginning of

```
1         a shift or you can ride separate.  We usually double

2         after midnight.  So it is your choice, whether you want

3         to double up before midnight or if you want to ride

4         solo before midnight.

5    Q    Why is that?

6    A    Why is it that we can ride solo?

7    Q    Why is it that you double up after midnight?

8    A    For safety, in general.

9    Q    You would agree that Friday evenings are known to be a

10        time where there is more calls for service; is that

11        fair?

12   A    No.

13   Q    No?

14   A    No.

15   Q    So you generally don't find Friday evenings to have

16        more calls?

17   A    Lately it has been Sundays.  I can't make a

18        generalization about a day of the week, just it is just

19        hit and miss depending on when activity is highest.

20        For some reason Sundays have been the busiest lately

21        for me.

22   Q    So there is not much impact caused by the end of the

23        workweek, people having the weekend, in your

24        experience?

25   A    Not in Forsyth.
```

```
 1   Q    What were the shift changes at Forsyth Township Police
 2        Department in late March of 2019?
 3   A    I believe it would have been seven a.m. to seven p.m.
 4        was day shift, and seven p.m. to seven a.m. was night
 5        shift.  And I don't recall if -- I don't recall if
 6        there was a mid shift, or it would have been maybe like
 7        a three to three, or a five to five, like a mid shift.
 8        I don't recall what that was at that time.
 9   Q    So there may have been one, and there may not have been
10        one, or there is one and you just don't know what it
11        is?
12   A    For that specific day, or are you talking about for the
13        end of March?
14   Q    End of March, generally speaking.
15   A    There would have been some type of mid shift or night
16        shift.  I can't remember if we were doubled on night
17        shifts, or if we were -- if we had a mid shift.  It was
18        more than likely a mid shift, a three to three or a
19        five to five.
20   Q    But you don't specifically recall?
21   A    Correct.
22   Q    And as to the evening of March 22nd, 2019, you don't
23        specifically recall what the shifts were, whether there
24        was a mid shift or not?
25   A    There was no shift.
```

```
 1   Q    There was no mid shift?

 2   A    It was me.  I was working alone that night.

 3   Q    Why was that?

 4   A    Either my partner was off on vacation or sick, or we

 5        had a vacancy.  I don't recall.

 6   Q    On the night of March 22nd, 2019, was there a

 7        supervisor on duty?

 8   A    There was not.

 9   Q    So you are essentially by yourself --

10   A    Correct.

11   Q    -- in the department; right?

12   A    In the township, yep.

13   Q    So you are the only police officer on the night of

14        March 22nd, 2019, for Forsyth Township Police

15        Department; correct?

16   A    Correct.

17   Q    However, there are other police agencies that are

18        available to assist; correct?

19   A    Unknown.  I mean, there is other police agencies.  I

20        don't know if they were available to assist at that

21        time.

22   Q    Generally speaking, other police agencies are available

23        to assist; fair?

24   A    Yes.

25   Q    There is multiple agencies that have concurrent
```

```
 1        jurisdiction with Forsyth Township; correct?

 2   A    Michigan State Police, Michigan -- or I mean Marquette

 3        County Sheriff's Office.  Those are the only two.

 4   Q    So there is two other departments that have concurrent

 5        jurisdiction with Forsyth Township; correct?

 6   A    Correct.

 7   Q    Are there any mutual aid agreements with other police

 8        agencies in the area?

 9   A    I don't know if there was at that time.

10   Q    How about now?

11   A    I don't know that there is.

12   Q    Who was your partner at that time?

13   A    I don't recall.

14   Q    Who is your partner presently?

15   A    I don't have one.

16   Q    Do other officers have a partner?

17   A    Yep -- Yes, yes.

18   Q    Why don't you have one?

19   A    My partner accepted a job downstate.

20   Q    That was Officer Burch?

21   A    Yes.

22   Q    His position has yet to be filled?

23   A    Correct.

24   Q    Is the department looking to fill that position?

25   A    Yes.
```

```
 1   Q    When you responded to the call to KI Sawyer around

 2        nine-thirty, a little after nine-thirty, on March 22nd,

 3        2019, you were offered backup; correct?

 4   A    I believe at some point, yes.

 5   Q    You declined that backup; right?

 6   A    Yeah.  I -- Yes, at some point.  I don't recall when

 7        they asked me if I wanted backup.  Excuse me.

 8   Q    Bless you.

 9   A    Thank you.

10   Q    So does the sheriff's department have a satellite

11        office in Forsyth Township?

12   A    Unknown.

13   Q    Do the state police have a satellite office in Forsyth

14        Township?

15   A    Unknown.

16   Q    You don't know whether they have offices there?

17   A    That's correct.

18   Q    How often do you respond to calls with the Michigan

19        State Police?

20   A    Not often.

21   Q    On average?

22   A    Not often.

23   Q    Are we talking more than ten times a month, less than

24        ten times a month?

25   A    Probably less than ten times a month.
```

```
 1   Q    More or less than five times a month, would you say?

 2   A    I can't give you an exact number, it is variable.

 3   Q    I understand that.  I am just looking for a rough

 4        approximation.

 5   A    Between one and ten times a month.

 6   Q    Okay.  How about the sheriff's department, how often

 7        are you involved in calls with them on a monthly basis?

 8   A    Between one and ten times a month.

 9   Q    What did you do to prepare for your deposition today?

10   A    I reviewed the video briefly and then read through the

11        case report briefly, my section of the case report.

12        Also met with my attorney last week briefly.

13   Q    And I don't want to know the substance of that.

14   A    Understood.  But that was in preparation for this.

15   Q    Okay.  Did you give a practice deposition?

16   A    Did I give a practice deposition?

17   Q    Um-h'm.

18   A    No.

19   Q    So you reviewed the entire body cam footage?

20   A    Like I said, I just reviewed it.  I didn't -- Yeah, I

21        did review the entire body cam footage of the original

22        incident.

23   Q    Anything else?

24   A    No.

25   Q    So the night of March 22nd, 2019, your shift would have
```

```
 1        started at seven p.m.?

 2   A    I believe so.

 3   Q    And given that, it would have ended at seven a.m.?

 4   A    Yes.

 5   Q    Before March 22nd, 2019, in the days before, what was

 6        your schedule?

 7   A    I don't recall.

 8   Q    So you don't recall when your last day off before that

 9        day was?

10   A    What day -- What day was it?

11   Q    Friday.

12   A    A Friday?  So I would have had Wednesday, Thursday off

13        before that.

14   Q    Did you do any work for the Keweenaw Bay Indian

15        Community Police Department on that Thursday -- or

16        Wednesday, Thursday?

17   A    I don't believe so.  I don't recall, though.

18   Q    So you don't think so, but you are not 100 percent?

19   A    Correct.

20   Q    Do you know how many shifts you had with KBIC Tribal

21        Police that week?

22   A    No.

23   Q    Do you have access to records that could inform you of

24        that?

25   A    No.  I --
```

```
 1   Q    Go ahead.

 2   A    I am just -- Like I told you, I am horrible with dates.

 3        I am trying to even -- Was I even employed with KBIC in

 4        March of 2019 for the date of this incident?  I --

 5   Q    So you are not sure if you were even employed with --

 6   A    Correct.

 7   Q    -- KBIC Tribal Police at the time of this incident?

 8   A    I thought I started in December of 2019 or something

 9        like that.

10   Q    I apologize, you are correct.  Yeah.  I thought you

11        were there longer, but no, December 19.  So you started

12        with the Keweenaw Bay Indian Tribal Police after this

13        incident occurred; is that correct?

14   A    Correct, correct.

15   Q    Okay.

16                   (Plaintiff's Exhibit No. 1 marked.)

17   BY MR. TOUTANT:

18   Q    So I have marked as an exhibit a five-page document.

19        Have you ever reviewed this document before?

20   A    I have not.  I have not.

21   Q    I would like you to assume that this is the

22        Communications Event Report from the Marquette County

23        Central Dispatch office.  Are you familiar with the

24        Central Dispatch?

25   A    Yes.
```

```
 1    Q    Have you reviewed documents like this before in the
 2         course of your employment as an officer for the Forsyth
 3         Township Police Department?
 4    A    Yes.
 5    Q    Could you tell me how it is that information is
 6         communicated from Central Dispatch to you while you are
 7         responding to a call?
 8    A    Via radio.
 9    Q    So if a 911 call is coming in, and you are in the
10         process of responding, in other words, you are driving
11         to the scene of where you have been dispatched, you are
12         being given information over the radio?
13    A    Correct.
14    Q    And so as the 911 call is being made, the dispatch is
15         giving you the information that's being conveyed by the
16         911 call; correct?
17    A    Yeah.  They are receiving information.  Sometimes they
18         give us the information after they get off the phone.
19         Sometimes they are on the phone with a person, and they
20         are relaying information as we are driving, depending
21         on the situation.
22    Q    How does that work, if they are on the phone with the
23         person?  Are you hearing the call, or do they have like
24         a two-person system, where one person is taking the
25         call, and the other person is running the radio ops, or
```

```
1          how does that work?

2     A    We can't hear the caller.  I don't know how it works up

3          there.

4     Q    Okay.

5     A    I can't speak for their job.

6     Q    But you know that sometimes they are fielding a call

7          and communicating information to you at the same time?

8     A    I would guess.

9     Q    In terms of -- If you look at the first page of Exhibit

10         One, about a little more than halfway down, you see

11         there is some times stated.  Do you see that?

12    A    Yeah, I do.

13    Q    When you received this call, where were you?

14    A    I don't know.

15    Q    Were you at the office, or were you on another call?

16              MR. FOSMIRE:  I object because there might

17         not be only those two choices.

18    BY MR. TOUTANT:

19    Q    Or something else?

20    A    I don't recall.

21    Q    Routinely, when you receive a call, where are you?

22    A    Either in the car, in the office, on another call.

23         That would be mostly the three places.

24    Q    On a given shift, where do you spend most of your time?

25    A    In the office, in the car.  That would be most of our
```

```
 1      time --

 2   Q  Okay.

 3   A  -- unless we are on a call.

 4   Q  Right.  And obviously, when you are -- when you are

 5      responding to a call, you are responding to a call.

 6      But I take it you are not responding to calls

 7      constantly for your entire shift; is that fair?

 8   A  That's correct.

 9   Q  In terms of breakdown of, you know, in a patrol car

10      versus at the office when you are not responding to a

11      call, what's the approximate breakdown for that?

12   A  Unknown.  It is variable.

13   Q  So looking at the times on the first page of Exhibit

14      One, it says that the first dispatch was at 21:39:29,

15      which would be 9:39; correct?

16   A  The first number on this page that you are reading

17      is -- yes, that is correct, that's the first thing on

18      this page for the time stamp.

19   Q  The first dispatch?

20   A  Yeah.  It says dispatch -- That's what it says, that

21      date and then 21:39:29.

22           MR. FOSMIRE:  Are you looking, Phil, on the

23      "Times" section or the "Radio Log" section?

24           MR. TOUTANT:  The "Times" section.

25           THE WITNESS:  Oh, the "Times" section, okay.
```

```
 1              MR. FOSMIRE:  He is looking there.
 2        Everything shows up in bold.
 3              THE WITNESS:  So it says "Call Received."  Do
 4        you want me to read this off?
 5              MR. TOUTANT:  No, no.
 6              THE WITNESS:  What are we doing?  I don't
 7        understand.
 8  BY MR. TOUTANT:
 9  Q    I am going through it and -- and I will have some more
10        questions.  For one, I am just kind of confirming a
11        time frame.
12  A    So let me just say, I don't usually deal with this.  So
13        this is going to be the first time we are going through
14        this.  You asked me if I have seen these, reviewed
15        them.  I have seen them.  I have put them into case
16        folders.  I am not going to be able to decipher this
17        for you.
18  Q    Okay.
19  A    Do you know what I am saying?
20  Q    Yeah.
21  A    Okay.
22  Q    I think I --
23  A    So --
24  Q    I think I understand that.
25  A    Okay.
```

```
 1   Q   But the dispatch time, which is stated in the "Times"
 2       section, and in the "Radio Log," says that 8416J was
 3       dispatched at 21:39:29, which would be 9:39; correct?
 4   A   Correct.
 5   Q   And 8416J is your unit; correct?  That's you?
 6   A   Yeah.  I -- I would -- I am guessing.  I was the only
 7       one working.  So like I told you, I can't decipher why
 8       they put 8416J.  I would assume that's me because
 9       that's my badge number, but --
10   Q   So 8416 is your badge number?
11   A   Right.  I don't know why they put "J" on it.
12   Q   And up at the top you see, in the very first box, in
13       the center of it, it says, "Prime Unit 8416J," and it
14       has your name; is that correct?
15   A   Yes, it does have that up there.
16   Q   There is underneath the -- in the "Radio Log,"
17       underneath the line for when you were dispatched, there
18       is an entry that says "En-Route."  Does that mean
19       that's when you left?
20   A   No, that doesn't.
21   Q   What does that mean?
22   A   It just -- I don't know what it means.  I -- I
23       assume -- because then it has -- below that, it has I
24       arrived two minutes later.
25   Q   So "En-Route," generally speaking, means that you are
```

```
 1       on your way; right?

 2   A   Yes.

 3   Q   And then "Arrived" means that you are there; right?

 4   A   Like I said, I don't know how they break these things

 5       down.  I would assume that's what it means.  But if you

 6       are looking at -- I can't speak for how they do this,

 7       and I can't speak for how they are operating that

 8       night.

 9   Q   Okay.  Do you have reason to believe that they would

10       have put down anything else for arrival other than you

11       arriving?

12   A   What I am saying is, when you are asking me why -- or

13       if the "En-Route" time is the actual en route time, I

14       don't know what they were dispatching, how busy they

15       were, blah, blah, blah, this and that.  So I have no

16       idea.  I don't know what that means, other than it is

17       -- I don't know if I said en route at 21:46, or if they

18       put me en route at 21:46.  You know what I mean?  I

19       don't know exactly how they are deciphering this thing.

20   Q   Is it your habit, routine and practice to report to

21       Central Dispatch when you are en route to a call?

22   A   No.

23   Q   So you normally don't report when you are on your way?

24   A   Usually they dispatch me to a call, and I go.  I don't

25       have to say, en route.
```

```
 1   Q    When you arrive at the scene of a call where you are
 2        being dispatched to, do you inform Central Dispatch
 3        that you have arrived normally?
 4   A    Yep.
 5   Q    So you do do that --
 6   A    Yes.
 7   Q    -- routinely?
 8   A    Yes, that's routine.
 9   Q    Okay.  And then these times, for some of these things,
10        like arrival, dispatch, en route, for this night and
11        this incident, do you have any recollection of the
12        times that are stated in here being incorrect?  Do you
13        have other recollections of times, other than those
14        that are stated in here?
15   A    No.
16   Q    Okay.  So you have no reason to dispute these times;
17        correct?
18   A    Right.  And I can't confirm these times either, other
19        than they are on this paper.
20   Q    And that you routinely radio in when you arrive at a
21        scene; right?
22   A    Correct.
23   Q    And from what I see on the dispatch log, the radio log,
24        it says you arrived at 9:48; correct?
25   A    Yes.
```

```
 1   Q   And in the "Times," it says, therefore, 12 minute, 13

 2       second reaction time.  Does that sound right?

 3   A   Where are you looking?

 4   Q   In the "Times" section.

 5   A   In the "Times" section.  So it says, Call Received,

 6       Call Routed, Call Take Finished, 1st Dispatch, are you

 7       -- "1st En-Route."  Are you talking about "1st

 8       En-Route"?

 9   Q   If you look to the right of "First Arrived," you see

10       12 minutes 13 seconds, and it says "Reaction Time."

11   A   "Reaction Time?"  "Unit Reaction," is that what you are

12       looking at?  Oh, "Reaction time," got it, got it.

13       Sorry.

14   Q   The "Unit Reaction" says 8 minutes 55 seconds, which is

15       from dispatch to arrival.  That would be you; right?

16   A   I -- "Unit Reaction."  I -- Like I said, I don't know

17       what these phrases and terms mean, and I am not going

18       to be able to break this down for you.  I don't -- You

19       would be best to get a dispatcher in here to break down

20       these times for you.  I don't -- I can't break down the

21       verbiage that they are utilizing, and I can't break

22       down what unit reaction, en route, on-scene -- well,

23       obviously "On-Scene," it would be -- but then it

24       says -- after "On-Scene," it says "1st Arrive to Last

25       Clear."  What does that even mean?  So I can't break
```

```
 1          this sheet down for you because I don't know the times,

 2          and I don't know their verbiage that they are

 3          utilizing.

 4    Q     Okay.  So does it sound consistent that -- with your

 5          recollection, that you could have taken 8 minutes 55

 6          seconds to get to the scene?

 7    A     It could have taken me -- Yeah, it could have taken me

 8          that long to get to the scene.

 9    Q     Usually how long does it take for you to get from the

10          Forsyth Township Police Department in downtown Gwinn to

11          K.I. Sawyer?

12                MR. FOSMIRE:  Objection.  That assumes that

13          there is a usually.  Are you talking about without a

14          call or --

15    A     Yeah.  Are you -- Are you talking about a domestic

16          violence?

17    Q     Well, sure.

18    A     Are you talking lights and sirens?  Are you talking

19          driving 55 miles an hour?

20    Q     Well, let's break that down I guess.  So if you are

21          dispatched on a potential domestic violence call, are

22          you using lights and sirens to get to the scene?

23    A     Depending on traffic and depending on the call.

24    Q     How do you get that information?  In other words, how

25          do you determine whether or not you are going to use
```

```
 1        lights and sirens?

 2   A    If the physical assault is actually occurring at the

 3        time of the call, of course you are going to use lights

 4        and sirens to get to the call as quickly as possible.

 5   Q    If it is an allegation that it was something that

 6        occurred -- had occurred in the past, what do you do

 7        normally?

 8   A    Probably no lights and sirens, and -- unless depending

 9        on traffic, or if the parties haven't been separated,

10        and there is other mitigating circumstances.  There is

11        just so many --

12   Q    In this --

13   A    -- variables.

14   Q    Sorry.  In this circumstance, did you use lights and

15        sirens to get to the scene?

16   A    I don't recall.

17   Q    If you would have used lights and sirens, how long

18        would it have taken you, based on your experience?

19   A    To go from the office to their address?

20   Q    Correct.

21   A    Yeah.  I mean, between seven-and-a-half to nine

22        minutes, depending.

23   Q    Without lights and sirens, what do you think?

24   A    Without?  Probably 10 to 15 minutes, like I said,

25        depending on traffic.
```

1    Q    So if you turn to page three, and you see down at
2         21:41, it says, "8146 advised, declined another unit."
3         Do you see that?
4    A    Page three of three you are looking at?
5    Q    Yes.
6              MR. FOSMIRE:  Can you tell us where on that
7         page, Phil?
8              THE WITNESS:  Can you just point it out?
9    BY MR. TOUTANT:
10   Q    (Indicating).
11   A    Yes, I do see that.
12   Q    So you see this information as you are going through
13        these entries.  Is this the kind of information that's
14        routinely communicated to you --
15   A    No.
16   Q    -- while you are responding to a call like this?
17   A    No.
18   Q    You don't dispute that you declined another unit,
19        though; right?
20   A    That's correct.
21   Q    And you were on the scene at 9:48; correct?
22             MR. FOSMIRE:  Per this document.
23   A    Per this document, yes.
24   Q    And per this document, you declined another unit at
25        9:41; correct?

```
 1   A    That's what this -- That's what this document says.

 2   Q    Therefore, you would have declined another unit while

 3        you were on your way there?

 4   A    That's what this document says.

 5   Q    If that's true, then you would have declined a unit --

 6        declined backup without knowing what the situation

 7        actually was; is that fair?

 8   A    No, that's not fair.

 9   Q    So what made you decline backup before you got there?

10   A    I don't know that I did.  That's what this document

11        says, but I am not sure that I did.  I am unable to

12        recall that.

13   Q    Do you recall again denying backup once you were at the

14        scene?

15   A    Yes, I do recall that.  That's the only time I recall

16        actually denying back up.

17   Q    I see.  So you refreshed your recollection by watching

18        the body cam video?

19   A    Correct.

20   Q    How many ambulances were there by the time you cleared

21        the scene?

22   A    Two.

23   Q    Do you remember who they were?

24   A    Forsyth and MGH or UP Health Systems-Marquette.  I

25        don't recall which the hospital was called at that
```

44

```
 1      time.

 2   Q  Do you know why that was the case, why two were sent?

 3   A  Sorry, I didn't hear the question.

 4   Q  Do you know why two ambulances were sent?

 5   A  It is common practice.  Our EMS is only basically able

 6      to do minimal things unless we actually have an EMT

 7      working.  So any time there is a call and there is no

 8      EMT working, U.P. Health Systems-Marquette, or MGH at

 9      the time, will send a second ambulance because they are

10      all I believe EMTs, or 99 percent of them are, unless

11      they are in training.

12   Q  All right.  The township is volunteers --

13   A  Correct.

14   Q  -- for the ambulances; correct?

15   A  Correct.

16          THE WITNESS:  Are we in between something

17      here?  Can I use the bathroom again?

18          MR. TOUTANT:  Yeah, yeah.

19          THE WITNESS:  I drank a Red Bull before I

20      came in.

21          THE VIDEOGRAPHER:  Let me go off the record.

22      We are going off the record, and the time is 2:20 p.m.

23          (Discussion off the record.)

24          THE VIDEOGRAPHER:  We are back on the record,

25      and the time is 2:24 p.m.
```

1    BY MR. TOUTANT:

2    Q    On March 22nd, 2019, what kind of prior history did you

3         have with Vickie Lara?

4    A    Multiple meetings with Vickie.

5    Q    When you say "meetings," what do you mean?

6    A    Called -- We were called many times over my time period

7         with Forsyth Township Police Department, to deal with

8         Vickie.

9    Q    What do you mean by "deal with"?

10   A    We had multiple calls throughout my time at Forsyth

11        Township to meet with Vickie on calls, whether she

12        called or Mr. Hill called or somebody else called.  So

13        we had multiple meetings, met with Vickie multiple

14        times throughout my career with Forsyth Township.

15   Q    Okay.  What was your impression from those meetings,

16        generally?

17   A    I don't understand the question.

18   Q    What kinds of calls did you respond to concerning

19        Vickie?

20   A    All kinds of calls, medical calls, argument calls

21        between her and Mr. Hill, just all types of calls.  In

22        general, just a wide array of calls with Vickie.

23   Q    As of March 22nd, 2019, what kind of prior history did

24        you have with Jack Hill?

25   A    Same thing.  The only time I think I ever dealt with

```
 1          Jack Hill -- I mean met with Jack Hill, sorry.  We say
 2          "dealt" -- met with Jack Hill was when we were dealing
 3          with Vickie, too, for the -- I think for the most part.
 4     Q    When you say, with regard to Vickie, multiple calls or
 5          multiple meetings, I mean, do you have a ballpark of
 6          like how many or how often or --
 7     A    No, I don't.  It is --
 8     Q    You chuckle.  I take it, it is a lot?
 9     A    It is a lot.  It is a lot.  I mean, when you know --
10          When she knows me and knows my first name, and I know
11          her well enough to -- Yeah, it is -- it was a lot, a
12          lot over my time working at Forsyth Township Police
13          Department.
14     Q    Those calls could be frustrating at points?
15     A    Yes.
16     Q    From those calls, did you have knowledge of whether or
17          not there was firearms in their house -- or their
18          apartment?
19     A    I have never known there to be firearms in their
20          apartment, no.
21     Q    On the night of March 22nd, no weapons?
22     A    No weapons that I know of.
23     Q    And when you saw Jack Hill, when you came into the
24          apartment on March 22nd, 2019, you didn't see that he
25          was in possession of a weapon?
```

```
 1    A    Correct.

 2    Q    Certainly he didn't have a weapon on him or in his

 3         possession; correct?

 4    A    Not that I could see.

 5    Q    And not in his general vicinity; right?

 6    A    Correct.

 7    Q    I noticed in Exhibit One, in the Central Dispatch

 8         records, it is -- it states that there is no weapons in

 9         the house.  Do you know if that was conveyed to you

10         that night before you got there?

11    A    I don't recall.  That would -- So, in general, those

12         very few things, alcohol is involved, and there is no

13         weapons in the house, those are the two normal things

14         conveyed.  I don't recall any of this other stuff that

15         I have -- that you were -- pointed out on page three.

16    Q    I see.  But routinely, you do receive information about

17         whether or not there is weapons and whether there is

18         alcohol?

19    A    Yes.

20    Q    And that's for a potential criminal investigation, I

21         take it; right, or is that anything, like dog at large?

22    A    No, no.  That's just mostly for anything assaultive is

23         going to come out with those two things, where two

24         people are in the same home.

25    Q    And there is a conflict of some kind?
```

```
 1   A     Correct.

 2   Q     What was the weather like that night?

 3   A     I don't -- Sorry.  In watching the video back, it

 4         looked to be snow on the ground.  I don't recall the

 5         temperature.

 6   Q     Did Jack Hill drive at that time?

 7   A     I don't know.  Did he drive, or could he drive?  Sorry,

 8         I didn't hear the whole question.

 9   Q     I think I said did he.  I think that was my question,

10         yeah.

11   A     Did he drive?

12   Q     Um-h'm.  I mean, like not that night, but was he

13         capable of driving?

14   A     I don't know.

15   Q     You don't know.  When the confrontation with him

16         happened, suffice it to say that he wasn't a flight

17         risk; fair?

18   A     I don't know what that means.

19   Q     He wasn't at risk for eluding you?  I mean, he was

20         across the room from you; right?

21   A     Yeah, he was not in a car.

22   Q     So -- And if he attempted to run away, you could have

23         caught him; correct?

24   A     I don't know.

25   Q     He is a 68-year-old man; right?
```

1   A    Was he 68 at the time of this?  I don't recall.

 2   Q    He is elderly, can we agree on that?

 3          MR. FOSMIRE:  I object to the reference to a

 4        68-year-old man as elderly.

 5   A    He is an older male subject, yes.

 6   Q    He would qualify for Medicare; right?

 7   A    I don't know.

 8   Q    AARP?

 9   A    I don't know.

10   Q    Not in great physical shape; true?

11   A    I don't know his physical shape or condition.

12   Q    Well, I saw in the body cam that you reviewed and took

13        down information from his driver's license; correct?

14   A    Correct.

15   Q    And you agree that height and weight is -- and date of

16        birth is routinely stated on a driver's license;

17        correct?

18   A    Correct.

19   Q    And so you would have looked at, during the course of

20        your investigation of this incident, Mr. Hill's

21        driver's license or ID card that had his height, weight

22        and age; correct?

23   A    Yes.

24   Q    And you also are able to assess things like that, in

25        terms of assessing a situation and assessing risk to

```
 1          safety and others at that scene; correct?

 2   A      Correct.

 3   Q      That's part of the use of force continuum, is it not?

 4   A      Correct.

 5   Q      So you need to assess whether or not a 68-year-old

 6          obese man is a flight risk; right?

 7   A      The term "flight risk," I just -- Do I need to know if

 8          Mr. Hill can run past me?  Yeah, that's why I block

 9          entrances and exits.

10   Q      To mitigate that?

11   A      Correct.  But I don't know how -- Trust me, there is

12          some very unbelievable things that can happen from

13          68-year-olds that -- Yeah, so --

14   Q      So you didn't make an assessment of whether Mr. Hill

15          was a flight risk then, I take it, from your responses?

16   A      I really don't know.  Can you define "flight risk"?  I

17          guess I just am not familiar with that term.

18   Q      Okay.  What is MCOLES?

19   A      Michigan commission of law enforcement officers.

20   Q      Does Michigan Commission On Law Enforcement Standards

21          sound correct?

22   A      Oh, there you go.  Sure, there you go.

23   Q      Okay.  Have you reviewed the MCOLES standards for use

24          of force?

25   A      No.
```

```
 1   Q   Have you reviewed the MCOLES standard for subject
 2       control?
 3   A   No.
 4   Q   So you don't know whether or not a subject is a flight
 5       risk is something that should be taken into
 6       consideration when using the use of force continuum,
 7       since you are not even familiar with what the term
 8       "flight risk" means; correct?
 9   A   I am not familiar with what the term "flight risk"
10       means.  I am familiar with the use of force continuum.
11   Q   Do you agree that when responding to an incident, an
12       officer must be in complete control of his or her own
13       emotions and actions; true?
14   A   Sorry, what's that?  I was distracted by the vibrating
15       phone.
16   Q   You agree that when an officer is responding to a call,
17       he or she must be in complete control of his or her own
18       emotions and actions; correct?
19   A   Yes.
20   Q   And that makes sense because fair, cool-headed behavior
21       can significantly reduce danger and deescalate a
22       situation; true?
23   A   Absolutely.
24   Q   On the contrary, arrogant, insensitive behavior can
25       intensify and invite hostility and danger, and can
```

```
1          escalate a situation; fair?

2    A     Yes.

3    Q     You agree that when you apply handcuffs, you need to

4          use clear and concise verbal commands; correct?

5    A     Yes.

6    Q     When a subject is face down on the ground, it is

7          difficult for the subject to know that he is -- needs

8          to present his arms to be cuffed if he is not

9          instructed to do so; correct?

10   A     No.

11   Q     Not correct?

12   A     You are -- Sure -- Can you restate the question,

13         please?

14   Q     Sure.  If someone is face down on the ground, and they

15         are not informed that they need to present their wrists

16         to be cuffed, there is no way for that person to know

17         that they need to present their wrists to be cuffed;

18         correct?

19   A     I am unsure.

20   Q     Well, I mean, how do we communicate as human beings?

21   A     Speaking.

22   Q     We speak.  And so as human beings, when we are speaking

23         to each other, if we would like someone else to do

24         something, what do we do?

25   A     Speak to them.
```

```
 1   Q    We ask them; right?

 2   A    Sure.

 3   Q    And so if we want to handcuff someone, as a law

 4        enforcement officer, we ask them to present their

 5        wrists to be cuffed; correct?

 6   A    Yes.

 7   Q    And if they don't, then that would be uncompliant;

 8        correct?

 9   A    Correct.

10   Q    Right.  And so if someone isn't told that they need to

11        present their wrists to be cuffed, they don't know that

12        they need to do that; right?

13   A    Correct.

14   Q    In this case, you didn't tell Mr. Hill to present his

15        wrists to be cuffed until you screamed at him to give

16        me your fucking arm; correct?

17   A    Incorrect.

18   Q    When did you tell Mr. Hill to present his wrists to be

19        cuffed before that?

20   A    I asked him to stand up, turn around, place his hands

21        behind his back so he could be arrested.

22   Q    All right.  After he was on the ground --

23   A    I asked him to present himself and be arrested multiple

24        times.

25                   MR. FOSMIRE:  Let him finish the question,
```

```
 1      please.

 2   BY MR. TOUTANT:

 3   Q    After he was on the ground, when did you ask him to

 4        present his wrists to be cuffed, sir?

 5   A    I didn't.

 6   Q    Until you said, give me your fucking arm; right?

 7   A    That may have been my verbiage, I don't recall exactly,

 8        but, yes.

 9   Q    When did you watch the video last?

10   A    I think Friday.

11   Q    Friday, so five days ago?

12   A    Or maybe it was -- What day is it?

13   Q    It is Wednesday.

14   A    Maybe it was this weekend sometime, Friday, Saturday.

15        I don't recall exactly when I watched the video because

16        I worked all weekend.

17   Q    Sure.  You don't dispute that you told him to give him

18        your fucking arm sic after he was already on the

19        ground?

20   A    Yeah.  I am not disputing that, no.

21   Q    After you were already applying knee strikes; correct?

22   A    I don't know if I applied a knee strike before or after

23        telling him to give me his arm.

24   Q    His fucking arm; right?

25               MR. FOSMIRE:  Object.
```

```
 1    A    I don't recall if I said, give me your fucking arm.

 2    Q    Do you recall screaming that?

 3    A    Loud clear commands, yes, I do.

 4    Q    As a law enforcement officer, you are obligated to use

 5         only the amount of -- only the amount of force

 6         necessary to control the situation; correct?

 7    A    Correct.

 8    Q    And that may mean avoiding confrontation until adequate

 9         backup is available; correct?

10    A    Correct.

11              MR. TOUTANT:  Forgive me.  I don't know where

12         I put my pen.  I found it.  It was in the book, my

13         apologies.  I like to use red to differentiate my

14         notes.

15    BY MR. TOUTANT:

16    Q    Over your career how many domestic violence calls have

17         you responded to, approximately?

18    A    A lot.

19    Q    In a given week, on average, how many?

20    A    Unknown.

21    Q    More than ten, less than ten?

22    A    In a week?

23    Q    Yeah.

24    A    I could have ten in a week, I could have zero in a

25         week.  It is unknown.
```

```
 1   Q    In terms of the frequency of calls that you respond to,

 2        where does a potential domestic violence call fit, if

 3        you were to rank them in your mind?

 4   A    In the middle to higher end.

 5   Q    Middle to high.  In terms of potential assaultive

 6        crimes, where does it rank, in terms of the frequency

 7        that you have to respond to calls like that?

 8   A    Top end of assaultive crimes.

 9   Q    That was my experience, as well, when I worked in the

10        prosecutor's office so I kind of figured that was what

11        you would see.

12             Domestic violence complaints, when you

13        respond to them, the situations can sometimes be

14        volatile; is that true?

15   A    Sometimes.

16   Q    Oftentimes, there is intoxication involved?

17   A    Sometimes.

18   Q    And also raised emotions?

19   A    Sometimes.

20   Q    And because you are going into a situation, as an

21        officer, you need to be prepared for those sometimes

22        events to be unfolding in front of you; correct?

23   A    Correct.

24   Q    You agree that all people in this country should be

25        free from excessive force by law enforcement officers;
```

```
 1      fair?

 2   A  Yes.

 3   Q  And that's the case even if you suspect that they have

 4      committed a crime; right?

 5   A  Yes.

 6   Q  That's the case even if they have hurt someone;

 7      correct?

 8   A  Yes.

 9   Q  Your duty as a law enforcement officer is to uphold the

10      Constitution; right?

11   A  Correct.

12   Q  It would be objectively unreasonable for you as an

13      officer to use more force than is necessary to complete

14      an arrest; true?

15   A  Correct.

16   Q  It would be objectively unreasonable to use knee

17      strikes on a subject when the subject is not actively

18      resisting you; correct?

19   A  Can you repeat the question?

20   Q  It would be objectively unreasonable if you were to use

21      knee strikes when a subject is not actively resisting

22      you; correct?

23   A  Can I change it to -- You said actively resisting me --

24   Q  Right.

25   A  -- but -- Does that include passive resistance?
```

```
 1   Q   No, it doesn't.

 2   A   I am just trying to make sure you are not trying to get

 3       me on a technicality.

 4   Q   I am not trying to get you on technicalities, sir.  I

 5       am just asking you questions that are relevant to the

 6       allegations in this case.

 7   A   Okay.  So that would be correct.

 8   Q   You think that's what I am trying to do, get you on a

 9       technicality?

10   A   I mean, I believe you are just trying to jam me up here

11       with some of these questions so --

12   Q   My client was in the hospital for two months, sir.

13   A   I am not here to dispute it with you.  I was just

14       trying to get -- make sure that you are --

15   Q   Okay.  So I will reask my question.

16   A   Sure.

17   Q   You agree that it would be objectively unreasonable for

18       you to use knee strikes on a person who is not

19       exhibiting active resistance?

20   A   Correct.

21   Q   That would be excessive force; right?

22   A   Correct.

23   Q   That wouldn't be in keeping with your oath as a law

24       enforcement officer either, would it?

25   A   Correct.
```

```
 1  Q    You agree that using knee strikes on a subdued subject
 2       is objectively unreasonable; correct?
 3  A    They would be on a subdued subject, yes.
 4  Q    You agree that using knee strikes on a subdued subject
 5       would be a battery, it would be an assault and battery;
 6       correct?
 7  A    On a subdued subject, yes.
 8  Q    The same goes for a subject who is not actively
 9       resisting, you can't use that kind of force on someone
10       like that; correct?
11  A    Actively or passively resisting, we are able to use
12       distractionary techniques, pain compliance.  That's
13       what knee strikes are.  I just -- You keep using
14       actively.  Passively, you are allowed to utilize that
15       for obtaining pain compliance or distractionary
16       techniques.
17  Q    Even when you are applying knee strikes, the amount of
18       force used cannot be excessive; correct?
19  A    That's -- I am trying to think of the right wording
20       here.  I guess that's all relative.  Like are you
21       talking about how hard the knee strikes are?
22  Q    Yes.
23  A    Okay.  Then I don't agree with your statement.
24  Q    Okay.  The frequency of the knee strikes applied cannot
25       be excessive, based on the totality of the
```

```
1          circumstances of the situation; is that fair?

2                    MR. FOSMIRE:  I will object to the form.

3     A    I -- You utilize the amount of force needed to do the

4          job at hand, take the person into custody.  So I -- I

5          guess I don't know if that answers your question.

6     Q    When you watched the video of Mr. Hill being arrested

7          by you, you heard him saying that he was in pain;

8          right?

9     A    I don't -- I don't know if he said he was in pain.

10    Q    You heard him say the word "hurt"; right?

11    A    I believe -- I believe he said that word.

12    Q    You heard him say, don't kill me?

13    A    I don't know that I heard that.

14    Q    But you did hear him say "hurt"; right?

15    A    Um-h'm.

16    Q    Yes?

17    A    Yes.

18                    (Plaintiff's Exhibit No. 2 marked.)

19    BY MR. TOUTANT:

20    Q    I have just handed you a two-page document that I have

21         marked as Exhibit Two.  Do you recognize this document?

22    A    Yes.

23    Q    It is your handwriting; correct?

24    A    Correct.

25    Q    What is this document?
```

```
1    A    Intake form into the jail.

2    Q    Did you fill this out routinely when you bring an

3         arrestee to the Marquette County jail?

4    A    Yes.

5    Q    Is this the form that you filled out on the night of

6         March 22nd, 2019?

7    A    Yes.

8    Q    When you took Mr. Hill to jail; correct?

9    A    Correct.

10   Q    So on the first page of this document, you wrote "No"

11        in response to the question, quote, do you have any

12        reason to think this person has medical concerns, end

13        quote; is that correct?

14   A    Correct.

15   Q    Did you perform any medical assessment on Mr. Hill?

16   A    No.

17   Q    I want to jump back to your training real quick.  You

18        do have some first aid training; correct?

19   A    Correct.

20   Q    As a law enforcement officer, you are a first

21        responder; correct?

22   A    Yes.

23   Q    So oftentimes you are the first person to present at a

24        scene where someone has been hurt; correct?

25   A    Correct.
```

```
 1    Q    And that's why it is important for you to have medical

 2         training like first aid; correct?

 3    A    Correct.

 4    Q    What other medical trainings do you have?

 5    A    Just basic first -- basic.

 6    Q    First aid?

 7    A    Basic first aid.

 8    Q    Do you have ACLS?  I am guessing no if you are -- But

 9         does that ring a bell at all?

10    A    I don't know what ACLS is.

11    Q    Okay.  CPR?

12    A    CPR, yep, that's general first aid.

13    Q    So you have -- Do you have an American Red Cross first

14         aid certification?

15    A    Yes.

16    Q    And then you also have a CPR certification?

17    A    I -- It is just -- I think we just get one card for it.

18         I think it is through --

19    Q    Okay.  I haven't done it since I was in Boy Scouts, so

20         it has been a while for me.

21    A    Yeah.  I don't --

22    Q    So you don't know what kind of certifications you have,

23         other than basic first aid?

24    A    Correct.

25    Q    And to your knowledge, that's lumping in both an
```

```
 1           American Red Cross first aid course and a CPR course,

 2           to your knowledge?

 3    A      Yeah.  I don't know if the -- I don't know if our CPR

 4           is American Red Cross or if it is -- I don't -- We get

 5           a card that says we are certified for CPR.

 6    Q      Okay.  You need to periodically renew that?

 7    A      Correct.

 8    Q      Okay.  Nevertheless, no medical assessment was

 9           performed on Mr. Hill; correct?

10    A      Correct.

11    Q      Down lower on this form, there is a box that says, was

12           force used during the arrest -- or during arrest?  Do

13           you see that?

14    A      I do.

15    Q      And it says, "Name what type of force."  Do you see

16           that?

17    A      Oh -- Sorry, it is very hard to read on this photocopy.

18    Q      Is that what it says?

19    A      Correct, yes.  That's what it looks like.

20    Q      Okay.  And you didn't put any information in there;

21           correct?

22    A      Correct.

23    Q      So the next page, if you turn to page two of that, it

24           has a box that says, "Victim Information."  That would

25           be the section that pertains to Ms. Lara; correct?
```

```
 1   A    Correct.

 2   Q    This page is redacted because that's the way that the

 3        sheriff's department produced it.  But you see down

 4        below, the bottom box in the victim's section says,

 5        quote, "Were there any injuries to the victim," and

 6        then "What type" in parentheses.  Do you see that?

 7   A    Yep.

 8   Q    And I read that correctly?

 9   A    Yes.  (Reading)  Yes.

10   Q    And your response was "No visible injuries"; correct?

11   A    Correct.

12   Q    And you signed your name to this?

13   A    Yep.  Yes.

14   Q    And you dated it March 22nd, 2019, at 2250.  That's

15        10:50 at night; correct?

16   A    Yes.

17   Q    So when you completed that form, you noted that

18        Ms. Lara had no visible injuries; correct?

19   A    Yeah.  Yes.

20   Q    Do you want to take a break briefly?

21   A    I am getting hot, and my eyes are itchy, and I could

22        use some more water.

23   Q    Okay.  Well, yeah.  Just you seem to be uncomfortable,

24        so I wanted to --

25   A    I am not uncomfortable, I am just --
```

```
 1              MR. TOUTANT:  Okay, okay.  That's fine.  Want
 2        to go off the record?
 3              MR. FOSMIRE:  Let's go off the record and get
 4        a refill of the water pitcher, please.
 5              THE VIDEOGRAPHER:  We are going off the
 6        record, and the time is 2:57 p.m.
 7              (Discussion off the record.)
 8              THE VIDEOGRAPHER:  We are back on the record,
 9        and the time is 3:05 p.m.
10              MR. TOUTANT:  All right.  We just took a
11        brief break.  It is fairly warm in this conference
12        room.  We have now got the air conditioning on, so that
13        will hopefully help.
14   BY MR. TOUTANT:
15   Q    What are Forsyth Township's use of force policies?
16   A    General guidelines on taser, deadly force and just
17        basic use of force.
18   Q    So there is guidelines -- general guidelines you said
19        on taser, use of force?
20   A    Yeah, deadly force.
21   Q    Deadly force?
22   A    Um-h'm.
23   Q    And then use of force in general, you said?
24   A    Yeah.  Yes.
25   Q    Those are written policies?
```

```
 1    A       Correct.

 2    Q       How often do you review them?

 3    A       Not often.

 4    Q       When is the last time you reviewed them?

 5    A       I don't recall.

 6    Q       More than a year, less than a year?

 7    A       Probably more than a year ago.

 8    Q       Do you know how often they are revised?

 9    A       I don't.

10    Q       Where are the policies on use of force kept at Forsyth

11            Township Police Department?

12    A       In the office.  We have a shelf with a bunch of

13            manuals.

14    Q       Manuals, policies -- Like in a binder or something?

15    A       The use of force -- I -- or I mean, sorry, the

16            department policies are in a binder.

17    Q       Who maintains those?

18    A       I don't -- I would assume the chief of police.

19    Q       Okay.  But you don't know for sure?

20    A       I don't know for sure.

21    Q       That's okay.

22    A       It is not me.

23    Q       Not you.  That's -- You are not the person who does

24            that?

25    A       Right.
```

```
 1   Q    Got it.  What is your knowledge of Forsyth Township's
 2        general use of force policy?
 3   A    It is basically the same as the force continuum.
 4   Q    What do you mean by that?
 5   A    It is just utilizing the amount of force necessary to
 6        do the job at hand, without utilizing excessive force,
 7        in general.  That's basically what it says.  When you
 8        are talking about the use of force policy and the
 9        continuum, it basically says I think that you can enter
10        the continuum at any point.  So it goes from verbal
11        commands to deadly force, and then you have an array of
12        force between that.  And so the use of force -- or the
13        use of force policy says that you can enter the force
14        continuum at any point in the continuum, and then you
15        can deescalate, you can escalate, depending on the
16        situation.
17   Q    Generally speaking, the goal is to deescalate, though;
18        correct?
19   A    Correct, correct.
20   Q    Is there any call schedule for officers who are not on
21        duty at a given time?
22   A    No.
23   Q    So within the department if -- on the night of
24        March 22nd, 2019, you are the only guy; correct?
25   A    Yes.  So I will put a caveat on that.
```

1  Q    Okay.

 2  A    If there were to be a murder, you would have Central

 3       attempt to call almost every person in the department

 4       who is available, and then whoever was available would

 5       respond to assist you.

 6  Q    So a very serious crime or a very serious threat, like

 7       an active shooter or something?

 8  A    Correct, active shooter, or a murder, or something like

 9       that, you know.  We have a detective sergeant, and that

10       is who would come assist with something very, very

11       serious like that.  But they are not going to get

12       called in for a domestic violence.

13  Q    And do they have pagers?

14  A    No.

15  Q    No call schedule or anything?

16  A    No.

17  Q    Okay.  That raises a good question, though, when you

18       said we have a detective sergeant.  Who is that?

19  A    Currently, it is Detective Sergeant Mills.

20  Q    At the time in question, do you know who that was?

21  A    Detective Sergeant Kjellin.

22  Q    Kjellin, okay.  Now Chief Kjellin; correct?

23  A    Correct.

24  Q    When you said -- I think you said the department

25       presently has seven officers, counting the chief;

1       correct?

2   A   I believe -- Yes.

3   Q   Does that also count the detective sergeant, as well?

4   A   Yes.

5   Q   Do you guys have any support staff, other than the

6       active law enforcement officers in your office?

7   A   We have an office manager.

8   Q   Okay.  What's that person's name?

9   A   Amanda Perry.

10  Q   So it is essentially an eight-person office?

11  A   Yes.

12  Q   And no one else in the office I guess?

13  A   No.  We do have active -- We call them active.  They

14      are volunteer people, but they are not -- they don't --

15      they are not certified.  They don't carry firearms.

16      They are just basically community patrol, our eyes, I

17      guess you would say, assisting.

18  Q   So not reserve officers?

19  A   No.

20  Q   Is there a schedule for the active folks?

21  A   There is not.

22  Q   Just kind of when they are available?

23  A   Correct.

24  Q   When you got to the apartment on the night of

25      March 22nd, 2019, you observed Jack Hill seated;

```
1        correct?

2   A    Correct.

3   Q    When you saw him, he didn't appear to be injured;

4        correct?

5   A    He was seated.  I don't -- I don't know if he was

6        injured or not.

7   Q    As far as you could see, he wasn't in pain, he wasn't

8        expressing he was in pain; correct?

9   A    He wasn't expressing he was in pain.

10  Q    And he wasn't engaged in any kind of guarding behavior

11       that people routinely use to indicate that they are in

12       pain?

13  A    Correct.

14  Q    So, for example, you know, if your side hurts, you kind

15       of lean over and hold a hand to it?

16  A    Correct.

17  Q    He wasn't doing anything like that; correct?

18  A    That's correct.

19  Q    So you had no indication prior to this altercation that

20       he was injured; correct?

21  A    Correct.

22  Q    When Mr. Hill moved towards Ms. Lara and you took him

23       down to the ground, he didn't make physical contact

24       with Ms. Lara; correct?

25  A    I don't know.
```

```
 1  Q   There was a couch in between him and her; right?

 2  A   There was.

 3  Q   When you took Mr. Hill down to the ground, he was kind

 4      of on the couch, so to speak; right?

 5  A   I don't -- I don't know.

 6  Q   That was what I saw.  I mean, you watched the video;

 7      right?

 8  A   Yeah.  I -- I can't tell you if he was splayed out over

 9      the couch or whatever.  It was -- It all happened so

10      quickly, so my memory of the incident and the video of

11      the incident.

12  Q   How many knee strikes did you use?

13  A   I think approximately three.

14  Q   So you say you think.  I take it you don't know,

15      because of issues with how fast this happened?

16  A   Yeah.  Three, maybe four.

17  Q   When you applied the knee strikes, did you move up

18      Mr. Hill's back with the knee strikes?

19  A   No.

20  Q   An eyewitness said that that's what you were doing.

21      You dispute that?

22  A   Yes.

23  Q   Did you have any interactions with Tim Normand before

24      this incident?

25  A   Yes.
```

```
 1   Q    When?

 2   A    I don't know.  I have had interactions with Tim Normand

 3        before this incident.

 4   Q    Are you sure about that?

 5   A    I don't understand what you are asking me.  Yeah, I

 6        have had interactions with Tim Normand before this

 7        incident.  I didn't recognize him until he gave me his

 8        ID and told me where he lived, and then I realized I

 9        knew where he lived.

10   Q    I see.  What was your prior contact with him?

11   A    I don't recall.

12   Q    The only reason why I ask is because I saw somewhere in

13        your report that he was not familiar to you.  Actually,

14        it is from your sworn affidavit.  Do you remember

15        signing an affidavit?

16   A    Um-h'm.

17   Q    Yes?

18   A    Yes.

19   Q    And do you remember that it was sworn and notarized?

20   A    Yes.

21   Q    There was a third individual there with whom I was not

22        familiar, Timothy Normand, reportedly a friend of the

23        couple's.

24             So that would be inconsistent with your

25        recollection, in your sworn affidavit?
```

```
 1   A    I wasn't familiar with him when I first arrived at the
 2        scene.  Like I said, after I got his ID, realized when
 3        he gave me his address, then I said -- I thought in my
 4        mind, okay, I have met you before.
 5   Q    I see.
 6   A    So, no, the only two I was familiar with was Richard
 7        Hill and Vickie Lara.
 8   Q    When you -- When did you prepare your report, by the
 9        way?
10   A    After the incident.
11   Q    When after the incident?
12   A    Sometime during that night.
13   Q    So the same night, you would have prepared the report?
14   A    Yeah.  Yes.
15             MR. FOSMIRE:  Do you need to take a look at
16        it?
17             THE WITNESS:  I believe so.
18             MR. FOSMIRE:  The time is on it.
19             THE WITNESS:  Well, it was --
20             MR. TOUTANT:  I can mark a copy, too.
21             MR. FOSMIRE:  Let's do that.
22             (Plaintiff's Exhibit No. 3 marked.)
23   BY MR. TOUTANT:
24   Q    I have marked a copy of your report as Exhibit Three.
25        I will just put it here.
```

1    A    Thanks.

2    Q    It is the same thing you have, presumably.  Why I am

3         asking that is I don't actually see like the time that

4         you would have finalized it or, you know, a lot of

5         times if you read a radiology report --

6    A    (Indicating.)

7    Q    What's this?

8    A    It is right here.  Narrative, FTPD, Justin Wonch.

9         That's what time I would have started the report.

10   Q    I see.  So you started the narrative report --

11   A    And it would have had to be at the prosecutor's office

12        the next day because it is a DV, so I would have had to

13        finalize that report at some point during the night.

14   Q    I see.

15             MR. FOSMIRE:  Where is it?

16             THE WITNESS:  (Indicating.)

17             MR. FOSMIRE:  Page two, okay, thank you.

18   BY MR. TOUTANT:

19   Q    So this report needs to be -- Because of the nature of

20        the allegation, for the arrest, it needs to be to the

21        prosecutor's office the next day, is that --

22   A    Correct.

23   Q    Is that a requirement of the department?

24   A    It is a requirement of the prosecutor's office.

25   Q    In your report -- How long did it take you to prepare

```
 1        it, by the way?

 2    A   I don't know.  I don't know if I had other calls that

 3        night.  I don't recall.

 4    Q   Customarily, how long does a report take you to

 5        prepare?

 6    A   Depending on the report, I -- from the looks of this

 7        report, maybe an hour.  I don't know.

 8    Q   Okay.  So page four of nine, if you would turn to that.

 9        Do you have that handy?

10    A   I do.

11    Q   There is a section in the middle entitled "The Arrest"?

12    A   Yes.

13    Q   And in the middle of that paragraph, there is a

14        sentence, it says, quote:  I grabbed Richard by the

15        jacket collar and assisted him to the ground.

16                Did I read that correctly?

17    A   Yes.

18    Q   Now, this report, you know, is going to be provided to

19        the prosecutor's office and be provided to Mr. Hill's

20        counsel; correct?

21    A   Yes.

22    Q   That's not how you described the maneuver that you

23        performed when you were describing it at the jail;

24        correct?

25    A   I don't recall my conversation at the jail.
```

```
 1    Q    You don't recall telling Officer Boniface (Phonetic

 2         Spelling) that you body slammed Jack Hill?

 3    A    I don't remember seeing Officer Boniface that night.

 4    Q    You don't remember describing the incident in the jail

 5         control room?

 6    A    I don't recall.

 7    Q    So you have no recollection of that?

 8    A    That's correct.

 9    Q    If it was written down in jail report documents, you

10         would not dispute that, though; correct?

11    A    I may dispute what's said, but I don't -- I don't know

12         what was written or anything like that so --

13    Q    But you have no recollection yourself; fair?

14    A    Correct.

15    Q    I would like you to assume that a report from the jail

16         said, quote:  Officer Wonch claimed that the subject,

17         Inmate Hill, went after his victim, name redacted, and

18         Officer Wonch stated he, quote, body slammed him, end

19         quote, to the ground to stop him from assaulting his

20         wife.

21              Do you recall that statement?

22    A    I don't.

23    Q    Do you disagree with that statement?  In other words,

24         do you claim that you didn't make a statement of that

25         nature?
```

```
 1   A    I am just saying I don't recall that statement.

 2   Q    Do you know Deputy Boniface to put incorrect

 3        information into her notes for the jail?

 4             MR. FOSMIRE:  Objection, argumentative.

 5   A    I can't speak for Deputy Boniface.  I don't work with

 6        her.

 7   Q    Okay.  Have you had any experiences like that, where

 8        people were putting statements that you didn't make

 9        into jail records before?

10   A    I didn't know my statements would be put in -- or are

11        put into jail records.

12   Q    You have never seen an incident in the past where there

13        has been your statements misstated or misconstrued in

14        the jail documents, to your knowledge?

15   A    I have never seen my statements put into a jail

16        document.

17   Q    So to your knowledge, that's never occurred; correct?

18   A    Like I said, I have never seen my statements put into a

19        jail document.

20   Q    Okay.  So as far as you know, it has never happened;

21        right?

22             MR. FOSMIRE:  Asked and answered.

23             MR. TOUTANT:  Not answered, asked.

24   A    Like I said, I have never seen my statements put into a

25        jail document.
```

```
 1    Q    Do you recall when Mr. Hill stated, you are hurting me,

 2         while you were applying knee strikes, you screaming,

 3         fucking right, you want to fucking attack people right

 4         in front of me, stupid fuck.

 5                   Do you recall saying that?

 6    A    If you had the video, I would be able to help you out

 7         more with that, but I mean, I don't -- I can't -- I

 8         can't explain the exact verbiage that was used.

 9    Q    Are you disputing the verbiage that I just quoted to

10         you?

11    A    I am not -- I am not disputing it.

12    Q    You said something along those lines; is that fair?

13    A    Correct.

14    Q    You would agree that's not very professional --

15    A    Correct.

16    Q    -- as a police officer; correct?

17    A    That's correct.

18    Q    You would agree that the Forsyth Township Police

19         Department has standards, where the officers of that

20         department are dedicated to the highest degree of

21         professionalism and police services; correct?

22    A    Correct.

23    Q    In fact, that's on the very front of your department's

24         website, did you know that?

25    A    I did not.
```

```
 1              MR. TOUTANT:  Mark it as Exhibit Four.

 2              (Plaintiff's Exhibit No. 4 marked.)

 3  BY MR. TOUTANT:

 4  Q    The first page, first paragraph, quote:  As a police

 5       department, the officers ded- -- are dedicated to the

 6       highest degree of professionalism and police services.

 7       Did I read that correctly?

 8  A    That's correct.

 9  Q    You would agree that you fell short of that standard

10       when you arrested Jack Hill; correct?

11  A    Incorrect.

12  Q    You don't think that you were being unprofessional when

13       you screamed at him, fucking right, you want to fucking

14       attack me -- want to attack people right in front of

15       me, stupid fuck?

16  A    That was unprofessional statement, yes.

17  Q    And that was below the standards of your police

18       organization; correct?

19  A    Correct.

20  Q    At one point you also said to Mr. Hill, who was

21       expressing pain, shut the fuck up, fucking piece of

22       shit; correct?

23  A    I don't -- I don't know if he was expressing pain, but

24       I may have said, shut the fuck up, you fucking piece of

25       shit.
```

1    Q    He was whimpering, wasn't he?

2    A    I don't believe so.

3    Q    You watched the same video I did; right?  Did you have

4         the sound on when you watched the video?

5    A    I did.

6    Q    Okay.  So you don't dispute that you told him to shut

7         the fuck up, fucking piece of shit?

8    A    I am not disputing that, no.

9    Q    Using language like that during the course of an arrest

10        doesn't help to deescalate a situation, does it?

11             MR. FOSMIRE:  I am going to object to the

12        lack of foundation for that question.

13   A    It probably would not help deescalate a situation,

14        using language like that.

15   Q    That wouldn't be in keeping with the MCOLES criteria,

16        completing an arrest either; right?

17             MR. FOSMIRE:  Same objection.  I don't think

18        deescalation applies when you are putting somebody --

19        trying to get them cuffed.

20   A    I don't know if that applies to the MCOLES.

21   Q    You haven't read anywhere in the MCOLES standards that

22        talking to people in your constituency like that is

23        appropriate, have you?

24   A    No.

25   Q    What are the signs and symptoms associated with police

```
 1        custody death syndrome?

 2                    MR. FOSMIRE:  I am going to object to the

 3        lack of foundation for that one.

 4    A   I am -- I guess I am not really sure what you are

 5        asking me.

 6    Q   Have you ever heard of that concept, the syndrome

 7        itself?

 8    A   Yes.

 9    Q   So you are familiar with the syndrome; right?

10    A   Yes, I have heard of it.

11    Q   Would it surprise you to learn that it is in the MCOLES

12        law enforcement standards?

13    A   Like I said, I haven't read the MCOLES law enforcement

14        standards.

15    Q   But you acknowledge that you need to be vigilant for

16        signs and symptoms of police custody death syndrome;

17        right?

18    A   When was that issued, that specific --

19    Q   It looks like 2006.

20    A   I am just saying -- I am just asking because it sounds

21        like a new revision.  I am sure it was updated at some

22        point recently.

23    Q   The only dates I am seeing on the standards -- the

24        state standards I am reviewing are from 2006 and 2002.

25        It doesn't -- These don't -- That doesn't sound
```

```
 1          familiar to you?

 2    A     No.  I mean, I know basic things about that, yeah,

 3          about that situation.

 4    Q     It is objectively unreasonable to use more force than

 5          necessary to complete an arrest; correct?

 6    A     That's correct.

 7    Q     You agree that, as a law enforcement officer, you are

 8          required to express anger in an appropriate and

 9          controlled manner; correct?

10    A     Yes.

11    Q     You need to maintain a reactionary gap, as well; right?

12    A     Correct.

13    Q     What's that?

14    A     The distance between you and the suspect.

15    Q     You agree that you are required to apply handcuffs by

16          using clear and concise verbal commands; correct?

17    A     Correct.

18    Q     Did you ever strike Mr. Hill with your fists?

19    A     No.

20    Q     Or with the heel of your hand?

21    A     No.

22    Q     So you disagree with the witness who testified to that?

23    A     I do.

24    Q     You agree that after you use force, you are obligated

25          to perform a medical assessment of an arrestee;
```

```
 1      correct?

 2   A  No, I am not aware of that.

 3   Q  In the documentation you provided at the jail, you

 4      didn't even acknowledge that you used force on

 5      Mr. Hill; correct?

 6   A  It was left blank.

 7   Q  Well, you completed the sections above and below it;

 8      correct?

 9   A  Correct.

10           MR. TOUTANT:  Was my level good beforehand?

11      I just noticed this thing sitting on my leg.

12           THE VIDEOGRAPHER:  That's all right.  I

13      adjusted it, so --

14           MR. TOUTANT:  Thank you.

15   BY MR. TOUTANT:

16   Q  Which knee strike caused fractures to Mr. Hill's ribs?

17           MR. FOSMIRE:  Objection to the lack of

18      foundation.

19   A  It is unknown if a knee strike caused fractures to

20      Mr. Hill's ribs.

21   Q  So you don't know which knee strike caused those

22      fractures?

23   A  I don't believe any knee strikes caused those fractures

24      to Mr. Hill's ribs.

25   Q  So how were Mr. Hill's ribs fractured?
```

```
 1   A    Unknown.

 2   Q    So somehow, he had -- You know he had 21

 3        fractured ribs?

 4   A    I have no idea -- I have no idea of Mr. Hill's medical

 5        conditions.

 6   Q    But he was walking and talking before you assaulted

 7        him; correct?

 8             MR. FOSMIRE:  Objection to lack of

 9        foundation.

10   A    Like I said, I have no idea of Mr. Hill's medical

11        conditions.

12   Q    Okay.  You did see him walking and talking before you

13        assaulted him; correct?

14             MR. FOSMIRE:  Objection to the lack of

15        foundation and to the form.

16   A    I saw him lunge after Vickie, so I guess your

17        assessment would be correct.

18   Q    And he was standing on his feet; correct?

19   A    Correct.

20   Q    Do you know which of your knee strikes injured his

21        spine?

22   A    I don't know that any of my knee strikes injured

23        Mr. Hill's spine.

24   Q    So you don't know?

25   A    No.  What I am telling you is I would -- I don't know
```

1      how Mr. Hill's spine was injured.

2  Q    But you agree that he was walking and talking before

3      you attacked him; correct?

4  A    I did not attack Mr. Hill.

5  Q    You don't think that was an attack?

6  A    I do not.

7  Q    Do you agree that a reasonable officer at the scene of

8      a potential DV, domestic violence call, cannot assault

9      a suspect with malice; correct?

10  A    Correct.

11  Q    You agree that, when considering the amount of force

12      necessary to subdue a resistant subject, the physical

13      attributes of the subject must be given due

14      consideration; fair?

15  A    Correct.

16  Q    Same goes for the size of the officer; correct?

17  A    Correct.

18            MR. TOUTANT:  That's all of the questions I

19      have at this time.  Thank you for your time, sir.

20                         EXAMINATION

21  BY MR. FOSMIRE:

22  Q    Officer, I have a couple of questions for you, just to

23      make a clarification.  Did you ever use a knee strike

24      on this man's back?

25  A    No.

```
 1              MR. TOUTANT:  Object to foundation.

 2    BY MR. FOSMIRE:

 3    Q    Where did you apply knee strikes?

 4    A    To the hip area.

 5    Q    Which of your knees did you use?

 6    A    Left knee.

 7    Q    Would you ever use a knee strike on a back?

 8    A    No.

 9              MR. TOUTANT:  Object to form and foundation.

10    BY MR. FOSMIRE:

11    Q    Did you use any part of your hands, fists or forearm

12         against his back?

13    A    Can you reask the question in a different way?

14    Q    Did you ever -- Did you use your fists or your hands

15         against his back?

16    A    My hands were against his back because I had his left

17         arm on his back, so my hands would be against his back.

18    Q    Okay.  I am asking you about a strike, though.

19    A    Yes.  I have never struck Mr. Hill in the back with

20         hands or fists or elbows.

21    Q    Forearms, elbows, also?

22    A    Correct.  None of those things.  I never struck

23         Mr. Hill --

24    Q    Okay.

25    A    -- with hands -- with all of those things you just
```

```
 1          mentioned.

 2    Q     Did you, in 2017, attend a training on threat pattern

 3          recognition?

 4    A     I did.

 5    Q     And where was that, please?

 6    A     I believe it was at Northern Michigan University.

 7    Q     And was it a matter of an hour, a half day, a full day,

 8          what's your best recollection of the length of that?

 9    A     It was a multiple day --

10    Q     Multiple?

11    A     -- training.

12    Q     Do you know who offered it?

13    A     Northern Michigan University through the consortium.  I

14          can't remember what it is called.  It is a -- It is

15          basically where they have trainers come in, and updates

16          come in and whatnot.  And that's offered through

17          Northern Michigan University, and if you are a member

18          of that group, you get a discount.  So, yeah, I can't

19          remember who the person presenting the thing -- the

20          presentation, the class, was.

21    Q     You talked before about legal updates that are offered

22          to officers and that you have attended, given by

23          lawyers from the prosecutor's office; correct?

24    A     Correct.

25    Q     Is this threat pattern recognition course something
```

```
1         that's offered by lawyers or by somebody else?

2   A     It is offered by the -- It is an MCOLES course, so it

3         is -- it is a certified MCOLES course.  So it would

4         have been put on by Northern, and then multiple

5         departments from across the county, maybe even further

6         than probably the U.P., are invited to attend this

7         course.

8   Q     Okay.  But in terms of who is giving you direction and

9         instruction in this course, what are their professional

10        qualifications in general?

11  A     They would be a trainer of that course.  I am unsure

12        further of their qualifications.

13              MR. FOSMIRE:  Okay.  Thank you.  That's all I

14        have.

15              MR. TOUTANT:  Nothing further.

16              THE VIDEOGRAPHER:  Let me go off the record.

17        We are going off the record at the conclusion of video

18        deposition of Officer Justin Wonch, and the time is

19        3:43 p.m.

20                      *  *  *  *  *

21              (The deposition concluded at about 3:43 p.m.)

22

23

24

25
```

1  STATE OF MICHIGAN    )
                        )
2  COUNTY OF MARQUETTE )

3       I certify that this transcript, consisting of 90 pages,

4  is a complete, true, and correct record of the testimony of

5  JUSTIN WONCH, held in this case on September 29, 2021.

6       I also certify that prior to taking this deposition

7  JUSTIN WONCH was duly sworn to tell the truth.

8

9

10 _____    _____
   Date                       Sandra A. Larson, CSR-2916, RMR
11                            Northern Reporters
                              P.O. Box 27
12                            Marquette, MI 49855

13

14

15

16

17

18

19

20

21

22

23

24

25