UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RICHARD J. HILL,

    Plaintiff,

v

JUSTIN WONCH, and
TOWNSHIP OF FORSYTH,

    Defendants.

U.S. District Judge:
  Hon. Hala Y. Jarbou

U.S. Magistrate Judge:
  Maarten Vermaat

Case No: 2:19-cv-159

_____/

| | |
|---|---|
| Phillip B. Toutant<br>Karl P. Numinen<br>NUMINEN DEFORGE & TOUTANT, P.C.<br>Attorneys for Plaintiff<br>105 Meeske Avenue<br>Marquette, MI  49855<br>(906) 226-2580 | M. Sean Fosmire<br>KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK<br>Attorneys for Defendants<br>1440 W. Ridge Street, Ste. C<br>Marquette, MI 49855-3199<br>(906) 228-0001 |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTIONS IN LIMINE**

**I. The bodycam video should be truncated**

**II. Section 1983 provides no remedy for an act of ordinary negligence**

**III. Officer Wonch's use of profanities do not provide a basis for a constitutional claim**

Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions. *Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064 (3rd Cir. 1990).

As stated by the Sixth Circuit in *Louzon v. Ford Motor Co.*, 718 F. 3d 556 (6th Cir. 2013):

> A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n. 2, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984)… In other words, the motion in limine is an evidentiary device that "provides a useful adjunct to other devices for truncating the trial such as motions for summary judgment." 21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5037.10 (2005).

### I. The bodycam video should be truncated

The evidentiary issue presented in this part of the motion is very well-suited for a motion in limine. The bodycam video depicting the interaction between Officer Justin Wonch and Jack Hill will be a major item of evidence, and having a ruling from the court in advance of trial as to what parts of the video can and cannot be shown will aid both sides in making reference to the video and what it shows, without unfair prejudice to either party.

The full bodycam video has already been submitted to the Court (ECF 34-1). It is 21 minutes long. The recording timer begins at 0:00 and ends at 21:01. (The encounter between Officer Wonch and Jack Hill began at roughly 9:30 pm on March 22, 2019, but the bodycam video does not have a stamp showing time of day.)

As the Court has noted in its previous rulings, the video covers four distinct segments of time for the interactions between Officer Wonch and Jack Hill. Officer Wonch is seen entering the apartment through the front door at about 00:50, after having been dispatched for a report by Vickie Lara of domestic violence by Jack Hill.

**Segment 1** – Wonch's interview of both Lara and Hill, including inspection of Lara's injuries from about 12:00 to 12:45, leading up to the instruction to Hill to stand to be handcuffed in the course of arrest (at 13:10). This segment includes at least 90 seconds of adamant bellicose refusal by Hill to cooperate while still seated, from 13:10 to 14:40. He then stands and faces Wonch, but refuses to turn around to be cuffed. This segment ends at about 14:55, with Hill still refusing to comply.

**Segment 2** – Hill launches himself over a couch at Vickie Lara (at 14:56), an attempted assault on her in Wonch's presence. Wonch, making a split-second decision, jumps against Hill to deflect him away from Lara, pinning Hill between his body and the couch before they fall to the floor, and they then end up on the floor next to the far wall. This is a short segment, from about 14:56 to 15:10 or so.

The bodycam is being worn by Wonch as the physical interaction begins, and thus the video does not show much about what happened during this segment or the next.

**Segment 3** (from 15:10 to 17:15) – Wonch and Hill are on the floor, with Wonch applying knee strikes to gain compliance, getting Hill's left arm (at about 15:25) and placing a handcuff on the left wrist (around 15:30), Hill continuing to resist to prevent Officer Wonch from getting access the other arm, and Wonch then getting the right arm out and the right wrist in the cuffs by 15:45.

Officer Wonch's position is that, once resistance had stopped and the cuffs were on, the knee strikes stopped.

The cuffs were then immediately double-locked to reduce pain and discomfort (at 16:05). Hill is on his back and Wonch instructs him to get up (at 16:25). Hill is lifted up on his feet by Wonch, with the assistance of Tim Normand (at 16:50), but he does not stay up. By 17:15 or so, Hill is back on the floor, on his back.

**Segment 4** (from 17:15) – Hill is dragged out of the apartment by Wonch and Normand, taken out the door (about 17:35), and placed on the ground outside the apartment, where Wonch stops to catch his breath. Even after Wonch lets him go, Normand continues to drag him for a few feet, until about 18:00. Wonch tells him to leave him, and tells Hill "Now you can make the decision when you want to get up." (18:06)

The court has already ruled that there was no excessive use of force involved in Segment 2 (bringing Hill to the floor) or in Segment 4 (taking him outside and placing him on the ground.) ECF 47, PageID.232. The only factual issues that are to be presented to the jury for its consideration are those involved in Segment 3. At PageID.236, the Court ruled:

> Under Counts I and III, Officer Wonch may be liable if he used knee strikes at any point after Hill stopped actively resisting arrest, which is a genuine dispute of material fact.

The bodycam footage in Segment 4, from 17:15 forward, should not be included in the video as shown to the jury. Given the court's summary judgment ruling as to Segment 4, showing this segment to the jury presents a serious risk of prejudice to the defendant, without that segment having any countering probative value at all.

The defendants therefore request that the video as entered into evidence and shown to the jury end at 17:15. Defendant has a second version that ends at that timestamp. The entire video, for purposes of the court record, should be separately marked and secured.

## II. Section 1983 provides no remedy for an act of ordinary negligence

A new theory of liability that has advanced by plaintiff's substituted expert witness appears to be that Officer Wonch acted negligently in appearing for the call to the home of Jack Hill and Vickie Lara without having another officer with him, in order to provide additional manpower to (among other things) keep the two sides away from each other as the interview was done. But that decision was *not a constitutional violation* in any way. This criticism implicates a simple claimed act of ordinary negligence, and there is no liability under §1983 for ordinary negligence. Only actions which are directed **against the plaintiff** and which violate his **constitutional** rights can provide such a cause of action.

The U.S. Supreme Court has said in a number of its cases decided under §1983, including *Monroe v. Pape*, 365 U. S. 167 (1961), that the system of liability adopted by Congress must be "considered against the background of general tort liability." That means only that the approach to claims and the remedies are similar, not that they are identical and not that they occupy the same ground. They clearly do not occupy the same ground. The Federal courts have been very careful to avoid making §1983 into a general Federal system of tort law.

*Griffin v. Breckenridge*, 403 U. S. 88, 101-102 (1971) was a case that involved a claim brought under another section of the Civil Rights Act of 1871 (§1985, rather than §1983) against two defendants who conspired between themselves to set upon and physically assault the two

black plaintiffs who were driving through Mississippi on personal business. One of the issues that was presented in the case was whether such a claim could be brought against individuals acting in a private capacity, and not under color of state law. That is not an issue that is pertinent to us here, but it did set the stage for the comments the we quote here.

The U.S. Supreme Court, speaking through Justice Stewart, was cognizant of the fact that liability under the Civil Rights Act of 1871 cannot be considered in any way to be coextensive with tort liability of an actor under state law. The majority opinion noted:

> "It is thus evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to §1985(3)'s coverage of private conspiracies. That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others, For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that **they did not believe**, in the words of Representative Cook, '**that Congress has a right to punish an assault and battery** when committed by two or more persons within a State.' Id., at 485.
>
> "The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of **invidiously discriminatory motivation** stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, quoted supra, at 100. The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all."

It is self-evident that there was no "invidious discriminatory motivation" in Officer Wonch's decision, before arriving at the apartment, to forgo the offer to send another officer to assist him with the response to the call. He did not know, in advance, that Hill would refuse to be arrested and that it would be necessary to resort to the use of reasonable force to make the arrest. Officer Wonch may have made a mistake, but that mistake did not deprive anyone of a

protected constitutional right. Indeed, the most foreseeable result of that mistake was probably serious harm to Officer Wonch himself.

In *Paul v. Davis*, 424 U.S. 693 (1976), defendant Paul, the chief of police of Louisville, Kentucky, was charged with having defamed the plaintiff by including his photograph in a listing of active shoplifters circulated among merchants in the city. If what was said by the chief of police was untrue, this would give rise to a claim for defamation under state law. But Davis did not bring a state law claim. Instead he attempted to bring his claim under §1983, asserting that the defendant's act of defamation deprived him of his [unspecified] constitutional rights under color of state law. The Supreme Court rejected his theory.

> "If respondent's view is to prevail… it would be difficult to see why the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle, would not have claims equally cognizable under § 1983.
>
> "It is hard to perceive any logical stopping place to such a line of reasoning." [at 698-699]

The Court noted that the idea that any wrongful act done by a governmental employee which had previously been considered to give rise only to a state law tort claim could support a claim under §1983 "would be contrary to pronouncements in our case cases on more than one occasion with respect to the scope of section 1983 and of the 14th amendment." The plaintiff's argument that the 14th amendment or §1983 protects him from all injury by a state actor by a tortfeasor

> "would make the make of the 14th amendment a font of tort law to be superimposed upon whatever systems may already be administered by the states. We have noted [citing *Griffin*] the 'constitutional shoals' that confront any attempt to derive from congressional civil rights statutes a body of foot general federal tort law. *A fortiori*, the procedural guarantees of the due process clause cannot be the source for such law."

One of the clearest discussions regarding the distinction between state-based tort law and constitutional claims under §1983 was made in the decision of the Eighth Circuit in *Bonner v. Coughlin*, 545 F.2d 565 (8th Cir. 1976). In that case, the plaintiff, an inmate in a state prison, lost a copy of a trial transcript that he had been using when he was taken from his cell and the prison guard negligently failed to close the door of his cell. When he returned, he found that his cell had been ransacked and the trial transcript was gone. He brought a claim under §1983, asserting that he had been deprived of his personal property without due process of law and violation of the guarantees under the 14th amendment. The Court rejected the claim. "We hold that Section 1983 does not provide a remedy."

It noted that "the plaintiff has pointed to no specific constitutional guarantee against the negligence of the two prison guards, even though they might be tortfeasors under Illinois law… If section 1983 is to be extended to cover claims based on mere negligence, the Supreme Court should lead the way."

It further commented:

> "We hold that the negligence of the guards which caused the loss of Bonner's transcript was not a State deprivation of property without due process of law under the Fourteenth Amendment nor action 'under color of state law' under Section 1983. No 'constitutional tort' has been alleged. In essence, Bonner's claim reduces to an assertion that substantive due process provides the foundation for an attack on the prison guards' conduct. It was precisely such an *ex proprio vigore* extension of the substantive aspect of due process that the Supreme Court rejected in *Paul*…"

*Fitzke v. Shappel*, 468 F.2d 1072 (6th Cir. 1972) involved a Michigan driver who was arrested after a motor vehicle accident and who made several medical complaints at the scene and in the jail cell before medical attention was provided. The court summarized the facts and the claim as follows:

> It is alleged that the arresting officer, Shappell, who apparently arrived at the scene soon after the accident, "conveyed Plaintiff to Eaton County Jail and incarcerated him there," having made no "inquiry into" nor expressed "concern for the physical condition" of the plaintiff, now appellant, Fitzke. The complaint affirmatively asserts that "[P]laintiff complained of leg pain and limped badly and communicated the need for medical attention, and said medical attention was denied him." It is further alleged that "[u]pon arriving at the Eaton County Jail or immediately thereafter, Plaintiff complained of said pain and numbness, and instead of obtaining vitally needed medical attention, Defendant(s) merely told Plaintiff to rub the areas of pain and numbness." The complaint alleges that appellant was at the time "suffering from a blood clot in the brain" and that he "was held in the said jail, from 1:30 AM on February 24, 1971, until 6:30 PM on the same day, a period of 17 hours, without necessary medical treatment, during which period he was suffering from serious brain injury, and during which period he was denied requested medical treatment."

The defendants were the Eaton County Sheriff and a deputy. Their motion was based on the argument that "if Count I of the complaint states a cause of action at all it is a tort action for negligence and not the deprivation of any constitutional right." The court disagreed, and provided a lengthy analysis that concluded that the claims as made were for "constitutional torts," not just ordinary negligence.

Thus, the issue in *Fitzke* was whether the claim as made "sounded in" ordinary negligence or in deprivation of constitutional rights. Indeed, the fact that the motion was analyzed by the court as it was confirms that the court would not have considered an ordinary negligence claim to be actionable under §1983.

**The expert's ordinary negligence opinions should be barred**

Plaintiff's substituted expert witness, Ken Katsaris, disclosed his opinions in a discovery deposition taken in Tallahassee, Florida on March 30, 2022. In the course of his deposition, it was evident that a major theory on his part is that Officer Wonch acted improperly in arriving at the Hill/Lara residence by himself, without backup, and that this was in contravention of standard practice in responding to a domestic violence situation. His theory as described was

MAR01:84413.1

that a second officer could assist in keeping the subject separated from the victim so that the questioning of the subject could proceed without undue interference, such as occurred here.

The testimony at the time of trial is expected to be Officer Wonch normally had a partner riding with him on his night shift hours, but that there was no partner that night, for reasons unknown. In this very small rural township, it sometimes occurs that there is only one officer who is on duty for road patrol on a given shift.

The testimony is also going to be that Central Dispatch (probably knowing of that fact) offered Officer Wonch the opportunity to have another officer from another agency dispatched to the location to assist. Officer Wonch, being familiar with Hill and Lara from earlier encounters, made the judgment call that additional assistance was not necessary and declined the offer. Officer Wonch may have been right and he may have been wrong on this point.

That claim is, however, simply one of *ordinary negligence*. If Officer Wonch made the wrong decision in declining the offer of assistance, this cannot form the basis of or support a claim for a constitutional violation under §1983. Again, the decision that he made was not one that impaired the constitutional rights of Jack Hill at the time.

There would also be significant causation issues. The failure on the part of the officer to keep the subject and the victim separated could not foreseeably lead to a direct attack on the victim in the very presence of the officer, nor could it be predicted at the time that Officer Wonch declined the offer of assistance that there would be a major act of resistance on the part of Jack Hill leading to the need to use reasonable force to bring him under submission and complete the arrest. If an ordinary negligence theory would could be a basis for liability, these are further arguments that could be made. Defendant's position at this point, however, is that

MAR01:84413.1

this ordinary negligence claim simply cannot be entertained by the court or given to the jury for its consideration. Further, any testimony from Mr. Katsaris in support of this theory of liability should be barred.

It is true that the plaintiff's complaint includes a state law-based claim as well as a claim under §1983. Plaintiff's state law claim, however, is solely one for assault and battery, not for negligence. Plaintiff claims only an intentional assault by Officer Wonch against Mr. Hill. He has made no claim of negligence in his complaint at all, and he could make no such claim. Under Michigan law, an individual who is an employee of a governmental agency, such as a police officer, cannot be held liable for acts of ordinary negligence when he is engaged in the exercise of a governmental function and if he is acting within the scope of his authority. MCL 691.1407(2).

**III. Officer Wonch's use of profanities do not provide a basis for a constitutional claim**

The defendant requests that the jury be instructed, at the time that the bodycam video is played and at the end of trial in its summarizing instructions, that the use of epithets, profanities, or foul language cannot in any way be considered to be part of the "use of excessive force" or actionable under §1983. The defendant further requests that the plaintiff's attorney be prohibited from making arguments of violation of constitutional rights based on the use of foul language.

It is true that "obscene language" can be found to be actionable as part of a §1983 claim under other dramatically different factual scenarios. See, e.g., *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990), in which two female police officers cited the use of obscene

language, as one of several aspects of hostile and abusive behavior as part of an overall claim of "pervasive and regular" misconduct by male officers directed against the plaintiffs, female officers, as part of a claim that they were subjected to a hostile work environment because of their sex.

> "The harassment allegedly included abusive language, destruction of property and work product, anonymous telephone calls and, eventually, physical injury to Andrews."
>
> "They both claim that women regularly were referred to in an offensive and obscene manner, and that they personally were addressed by the obscenities. Other women in the Division also confirmed the male use of obscenities in referring to women. Although there was evidence that such language was commonplace in police quarters, there was also testimony that such language was not ordinary, and Conn, a twelve-year police veteran, went as far as to say that she 'had never been called some of the names that [she] was called in AID.'"
>
> "According to Conn, when she returned from training and after she declined Stock's propositions, his attitude towards her changed; it became 'aggravated' and 'unfriendly'... She also recounted the sexually foul and lascivious language addressed to her specifically and women generally. When she complained to her superior, Sergeant Byrne, who was not made a party to the lawsuit, he remained unresponsive."

But in most cases outside of this context, in a case where the use of profanities and expletives was part of the interaction between an officer and a citizen, their use does not give rise to or support a §1983 claim. See *Oltarzewski v. Ruggiero*, 830 F. 2d 136 (9th Cir. 1987). In that case, brought by a prisoner acting *in pro per*, the primary claim was that the prisoner was deprived of the use of the law library, but he also asserted that the defendant corrections officer "used excessively vulgar language" when talking to him. The 9th Circuit Court of Appeals noted:

> "The district court was also correct in denying Oltarzewski's claim alleging that Ruggiero violated his civil rights by using vulgar language... As stated by the court in *Collins v. Cundy*, 603 F.2d 825 (10th Cir.1979), **"[v]erbal harassment or abuse ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983."** Id. at

> 827... In short, the alleged vulgarity does not establish a genuine issue as to any material fact." [emphasis added]

The plaintiff in this §1983 action was entitled to be free from excessive force – that is, physical force that exceeded the force needed to make the arrest. He had no constitutional right that he will not be the target of four- or twelve-letter words that may be used by the police officer arresting him. This is true regardless of whether the use of foul language was prohibited by the Department under its adopted rules and regulations.

KITCH DRUTCHAS WAGNER<br>
VALITUTTI & SHERBROOK

Dated:  April 11, 2022                    By:     /s/  *M. Sean Fosmire*
                                                           M. Sean Fosmire

MAR01:84413.1