```
 1         IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MICHIGAN
 2                NORTHERN DIVISION

 3   RICHARD J. HILL,       )
                            )
 4        Plaintiff,        ) Case No. 2:19-cv-159-HYJ-MV
                            )
 5   vs.                    ) U.S. District Judge:
                            )  Hon. Hala Y. Jarbou
 6   JUSTIN WONCH and       )
     TOWNSHIP OF FORSYTH,   ) U.S. Magistrate Judge:
 7                          )  Hon. Maarten Vermaat
          Defendants.       )
 8   _____)

 9        VIDEOTAPED DEPOSITION OF JOSEPH FITZGERALD

10        Taken on the part of the Plaintiff, at the
     Mackinac County Commissioner's Board Room, 100 South Marley,
11   St. Ignace, Michigan, on Wednesday, April 20, 2022, at about
     12:38 p.m.
12
     APPEARANCES:
13
     For the Plaintiff:   Mr. Phillip B. Toutant (P72992)
14                        Numinen, DeForge & Toutant, P.C.
                          105 Meeske Avenue
15                        Marquette, MI 49855
                          (906)226-2580
16                        phillip@numinenlaw.com

17   For the Defendants:  Mr. M. Sean Fosmire (P31737)
                          Kitch, Drutchas, Wagner,
18                        Valitutti & Sherbrook, P.C.
                          1440 West Ridge Street
19                        Marquette, MI 49855
                          (906)228-0001
20
         Videographer:    Tony Beres
21
22   Reported by:   Sandra A. Larson, CSR-2916, RMR
                    NORTHERN REPORTERS
23                  P.O. Box 27
                    Marquette, Michigan 49855
24                  (906)226-2706
                    northernreporters@yahoo.com
25
```

1

---

## TABLE OF CONTENTS

JOSEPH FITZGERALD

Examination by Mr. Toutant . . . . . . . . . . . . 4
Examination by Mr. Fosmire . . . . . . . . . . . 12
Re-Examination by Mr. Toutant . . . . . . . . . . 29

**EXHIBITS**

None.

2

---

```
 1                  St. Ignace, Michigan
 2          Wednesday, April 20, 2022 - 12:38 p.m.
 3            THE VIDEOGRAPHER:  We are on the record in
 4   St. Ignace, Michigan, for the video deposition of Joe
 5   Fitzgerald, in the matter of Richard J. Hill,
 6   Plaintiff, versus Justin Wonch, Defendant.  This is a
 7   matter currently pending in the United States District
 8   Court, Western District of Michigan, Northern Division,
 9   Case Number 2:19-cv-159-HYJ-MV.  Today's date is
10   Wednesday, April 20th, 2022, and the time is
11   approximately 12:32 p.m. [sic].  I am Tony Beres, video
12   operator for La Dolce Video.
13            Counsel, if you would put your appearances on
14   the record, the court reporter will then state her name
15   and swear the witness.
16            MR. TOUTANT:  Phil Toutant, appearing on
17   behalf of Plaintiff Richard Hill.
18            MR. FOSMIRE:  My name is Sean Fosmire, here
19   on behalf of Defendant Justin Wonch.
20            THE REPORTER:  And my name is Sandy Larson.
21            Would you raise your right hand, please?  Do
22   you swear or affirm the testimony you are about to give
23   will be the truth, the whole truth and nothing but the
24   truth?
25            THE WITNESS:  I do.
```

3

---

```
 1            THE REPORTER:  Thank you.
 2                  JOSEPH FITZGERALD
 3       having been first duly sworn, was examined and
 4       testified on his oath as follows:
 5                       EXAMINATION
 6   BY MR. TOUTANT:
 7   Q   All right.  So we are here today to have some testimony
 8       taken.  This is Phil Toutant.  I represent Richard Hill
 9       here.  Could you please state your name for the record?
10   A   Joseph Fitzgerald.
11   Q   Okay.  And for the jury, what do you do for a living,
12       Mr. Fitzgerald?
13   A   I have been in law enforcement for 33 years.
14       Currently, I am a deputy for Mackinac County Sheriff's
15       Department.
16   Q   Okay.  What other positions have you held in your 33
17       years?
18   A   I have been chief of police for different departments,
19       and I have also worked for the DNR Law Enforcement
20       Division as a detective for environmental crimes.
21   Q   Have you done any work as a training officer, done
22       training or anything like that?
23   A   Yes.  I was a defensive tactics instructor/trainer.  I
24       was also a firearms instructor, chemical repellants,
25       baton, for many years in the different -- in -- mostly
```

4

**Page 5**

| | | |
|--|--|--|
| 1 | | in the department with the Gaylord Police Department, |
| 2 | | where I was there for 24 years, with Gaylord. |
| 3 | Q | Gaylord for 24 years? |
| 4 | A | Yes. |
| 5 | Q | Was there a period of time where you were the chief of |
| 6 | | police for Forsyth Township? |
| 7 | A | Yes. |
| 8 | Q | Okay. Was that -- we are here today to talk about an |
| 9 | | incident that occurred on March 22nd of 2019. Were you |
| 10 | | the chief of police for Forsyth Township at that time? |
| 11 | A | Yes, I was. |
| 12 | Q | Okay. So at that time how did you come to learn that |
| 13 | | there had been an incident between Officer Wonch and |
| 14 | | Richard Hill? |
| 15 | A | If I remember correctly, I was informed by the |
| 16 | | undersheriff of Marquette County, because Mr. Hill was |
| 17 | | in their jail and was going to be going to the hospital |
| 18 | | in reference to injuries he sustained during that |
| 19 | | arrest, from what I was told. And that's how I started |
| 20 | | to learn about the arrest that took place. |
| 21 | Q | Was the undersheriff Dan Willey? |
| 22 | A | Yes. |
| 23 | Q | So Undersheriff Willey contacted you because of the |
| 24 | | extent of Mr. Hill's injuries? |
| 25 | A | Yes. |

**Page 6**

| | | |
|--|--|--|
| 1 | Q | Okay. So what did you do next? |
| 2 | A | What I did is I contacted my detective sergeant at the |
| 3 | | time, Brian Kjellin, and asked him to go over and |
| 4 | | interview the victim, witness at the house where the |
| 5 | | assault took place. And he went over and did an |
| 6 | | interview with those people at that time. |
| 7 | Q | Okay. What else did you do? |
| 8 | A | Once I got those -- he completed those interviews, my |
| 9 | | next step -- and this was two or three days later or |
| 10 | | something, I don't remember exactly the time frame -- |
| 11 | | was I wanted to get up to the hospital and interview |
| 12 | | Mr. Hill. I also was able to review the body cam |
| 13 | | footage from Officer Wonch's body cam. |
| 14 | Q | So you did review that? |
| 15 | A | Yes. |
| 16 | Q | Did you discuss the incident at all with Officer Wonch? |
| 17 | A | I, to this -- I don't remember discussing it with him |
| 18 | | at that point. I don't know if I had talked to him yet |
| 19 | | when I -- after I looked at the body camera footage. |
| 20 | Q | Let's talk about that. What was your impression of the |
| 21 | | body camera footage, based on your review of it? |
| 22 | | MR. FOSMIRE: Objection to the form of the |
| 23 | | question. |
| 24 | BY MR. TOUTANT: |
| 25 | Q | If you had any. |

*ruling requested*

**Page 7**

| | | |
|--|--|--|
| 1 | A | My opinion on what happened? |
| 2 | Q | Yeah. |
| 3 | A | Well, when I watched the body camera footage, I knew |
| 4 | | that there was some inappropriate actions taken by |
| 5 | | Officer Wonch, and they had to be investigated. And I |
| 6 | | advised the supervisor of the township at the time what |
| 7 | | was going on. |
| 8 | Q | In terms of -- you said inappropriate actions by |
| 9 | | Officer Wonch. What do you mean by that? |
| 10 | A | From what I could see in regards to possibly, without |
| 11 | | breaking the video down -- and again, it has been a |
| 12 | | while since I have looked at it -- I looked at it |
| 13 | | recently, but I haven't been able to break it down. |
| 14 | | And the knee strikes didn't look appropriate at the |
| 15 | | time, ~~and when -- when Mr. Hill was dragged out of the~~ |
| 16 | | ~~house all of the way out the door and to the patrol~~ |
| 17 | | ~~car, I didn't find that to be appropriate.~~ |
| 18 | | ~~MR. FOSMIRE: Okay. I am going to make an~~ |
| 19 | | ~~objection to that because it is non-responsive to the~~ |
| 20 | | ~~question and because it covers an area where the court~~ |
| 21 | | ~~has already ruled that there was no inappropriate use~~ |
| 22 | | ~~of force. I will move to strike this testimony from~~ |
| 23 | | ~~the record.~~ |
| 24 | | ~~MR. TOUTANT: All right.~~ |
| 25 | | |

**Page 8**

| | | |
|--|--|--|
| 1 | | ~~BY MR. TOUTANT:~~ |
| 2 | Q | ~~Let me ask you this. In terms of the knee strikes, did~~ |
| 3 | | ~~you find them to be appropriate?~~ |
| 4 | | ~~MR. FOSMIRE: Objection to the lack of~~ |
| 5 | | ~~foundation for the question.~~ |
| 6 | | ~~BY MR. TOUTANT:~~ |
| 7 | Q | ~~You reviewed the video; right?~~ |
| 8 | A | ~~Yes.~~ |
| 9 | Q | ~~And you just said, in response to a question, that you~~ |
| 10 | | ~~had concern about the knee strikes?~~ |
| 11 | A | ~~Yes.~~ |
| 12 | Q | ~~So did you find the knee strikes to be inappropriate?~~ |
| 13 | | ~~MR. FOSMIRE: Same objection.~~ |
| 14 | A | ~~Yes.~~ |
| 15 | Q | ~~Why you did find -- let me just ask you again.~~ Did you |
| 16 | | find the knee strikes to be inappropriate? |
| 17 | A | Yes. |
| 18 | Q | Why was that? |
| 19 | A | Because it appeared to me they were to the body, to the |
| 20 | | back and to the side of the -- of Mr. Hill. And like I |
| 21 | | said, being a defensive tactics instructor/trainer, we |
| 22 | | don't knee people in the back or in the sides. That's |
| 23 | | not appropriate. |
| 24 | Q | So where are knee strikes supposed to be applied, to |
| 25 | | your knowledge, if you know? |

1  A  Most of the time, it is at the side of the leg, where
2     the muscles are, to gain pain compliance. You are
3     looking to gain pain compliance.
4  Q  Okay. Based on your review of the video, did you have
5     any other observations, anything else that concerned
6     you?
7            MR. FOSMIRE: Objection to the form of the
8     question.
9            MR. TOUTANT: I will rephrase.
10           THE WITNESS: Okay.
11 BY MR. TOUTANT:
12 Q  Was there anything else from your review of the video
13    that concerned you?
14 A  The actions that were taken once the person was under
15    arrest, when they were -- when he was dragged out the
16    door.
17 Q  Okay.
18           MR. FOSMIRE: Make the same objection that I
19    did before.
20 BY MR. TOUTANT:
21 Q  Is that how -- is that how the situation should have
22    unfolded there?
23 A  No.
24 Q  How should the situation have unfolded?
25           MR. FOSMIRE: I am going to object to the

                                9

1     whole line of questioning, and if I can keep a
2     continuing objection, I would appreciate it.
3            MR. TOUTANT: That would be fine.
4            Go ahead, you can answer.
5  A  No. I have been doing this for 33 years. When you
6     arrest somebody, if they are intoxicated, you fight
7     with them in a house, and then you get somebody to
8     assist you, and you carry -- you know, carry them, walk
9     them out the door. I have never had to -- I have never
10    seen anybody dragged out the door and dragged to a
11    patrol car. That's not what you do.
12 Q  What should you do?
13 A  Again, you should be able to get them to their feet
14    with some help from a -- waiting for backup, another
15    partner. And if they are that intoxicated and the
16    ambulance is there that's going to take them to the
17    hospital, then you get the ambulance in there and you
18    put them on a gurney and strap them down, and you get
19    them to the hospital to be checked.
20 Q  Okay. So I want to jump back. You said that based on
21    your learning from Undersheriff Willey that Mr. Hill
22    was seriously injured, you asked Mr. Kjellin to go and
23    interview the witnesses?
24 A  Yes.
25 Q  So that was your request?

                                10

1  A  Yes.
2  Q  Is that normal, to reinterview witnesses in just a
3     domestic violence case, is that ordinary?
4  A  It can be, depending on what follow-up needs to be done
5     and, unfortunately, in this circumstance there was some
6     things that had to be looked into because of the
7     behavior of the officer at the time.
8  Q  I see. So in this case, when you directed Detective
9     Kjellin to go, I take it, it was because of officer
10    conduct?
11 A  Yes.
12 Q  What else did you do with regard to this incident after
13    -- after you learned of it?
14 A  At that point in time, I didn't do anything further. I
15    was requested to come to the supervisor's office, talk
16    about my job performance, and it was shortly thereafter
17    where I resigned my position with the Forsyth Township
18    Police Department.
19 Q  So you decided to resign?
20 A  Yes.
21 Q  And it was just kind of coincidental with the timing of
22    this incident?
23           MR. FOSMIRE: Objection to the form of the (waived)
24    question.
25 Q  Was it incidental to the timing of this?

                                11

1  A  Yes. I mean, I was -- I always kept the supervisor
2     informed of what was going on and he knew exactly --
3     you know, I told him what was going on with this
4     situation before I ended up resigning.
5  Q  Okay. If you hadn't have resigned, what would you have
6     done?
7  A  I would have carried out a further investigation of the
8     entire incident. I would have talked to Mr. Hill. I
9     would have followed through with a complete and
10    thorough investigation of the situation and what took
11    place. And if there had to be some sort of action
12    taken by me, it would have been taken.
13 Q  Okay. But you didn't have a chance to do that --
14 A  No, I did not.
15 Q  -- because you left?
16           MR. TOUTANT: Okay. All right. Well, that's
17    all of the questions I have for now.
18                    EXAMINATION
19 BY MR. FOSMIRE:
20 Q  Mr. Fitzgerald, where had you served as chief of police
21    other than Forsyth Township?
22 A  City of Gaylord, Eaton Rapids, and Peshtigo, Wisconsin,
23    and also Hesperia, Michigan.
24 Q  After you left the position of Forsyth Township Police
25    Department chief of police, did you serve as chief

                                12

Page 13:

1    anywhere else?
2 A No, I did not.
3 Q Did you serve in law enforcement anywhere else before
4    coming to the Mackinac County Sheriff's Department?
5 A No.
6 Q How long have you been here with the Mackinac County
7    Sheriff's Department?
8 A Two-and-a-half years now I believe.
9 Q You say you got a call from Undersheriff Willey. What
10    time of the day was it?
11 A I couldn't even tell you. It was during the day but I
12    don't remember. It was three years ago or whatever, so
13    I couldn't tell you what time of day it was.
14 Q It wasn't during the middle of the night?
15 A No.
16 Q If you were to find that he was transported to UPHS, as
17    it was known, at about 3:00 a.m., 4:00 a.m., something
18    like that, does that sound consistent or inconsistent
19    with what you understood?
20 A I couldn't tell you. I don't remember.
21 Q Would you have expected the undersheriff to give you a
22    call at the time that, as you say, he discovered that
23    injuries that he sustained in the arrest were required
24    to be treated at the hospital?
25 A And he did call me, but like I said, I don't know if it

Page 14:

1    was after Mr. Hill was transported to the hospital. I
2    don't know if he -- once, you know, he was transported
3    and he found out what serious injuries he had he called
4    me, I couldn't tell you, but I know I did get a phone
5    call from the undersheriff.
6 Q All right. But it doesn't sound like he called you
7    when he found out that he was being transported to the
8    hospital?
9 A I have no clue.
10    ~~MR. TOUTANT: I will object to foundation.~~ (waived)
11 A I have no clue.
12 Q Did you ask him anything about when it was that the
13    injuries were discovered, Sheriff -- Undersheriff
14    Willey?
15 A No. I think he just told me they found him there at
16    the jail, and they had to take him to the hospital, and
17    that he had some serious injuries.
18 Q You said, and you suggested to the jury, that you then
19    directed Brian Kjellin to go out and reinterview the
20    victim; correct?
21 A The victim and the witness that were at the house.
22 Q Okay. Well, did you know that the victims -- I am
23    sorry, did you know that the witness was at the house?
24    ~~MR. TOUTANT: Object to form and foundation.~~ (waived)
25 A At the time he went and interviewed him?

Page 15:

1 Q No, at the time that you directed him to go there. You
2    are making it sound like you told him to go to the
3    house, meaning the house where the incident happened --
4 A Right.
5 Q -- and interview -- reinterview the victim, meaning the
6    domestic violence victim?
7 A Yes, and the witness.
8 Q And the witness?
9 A Yes.
10 Q But you had no idea that the witness was at that house,
11    did you?
12 A I don't know. I just told him to go find him and
13    reinterview him.
14 Q And was that on the very same day that you got that
15    call from the undersheriff?
16 A I believe so.
17 Q And you told him directly for the purpose of what?
18 A I told him that we had a complaint that this guy
19    sustained injuries, go and reinterview them and let me
20    know what happened, so that if I have to take further
21    action, I will.
22 Q All right. So you told Kjellin, who was your detective
23    sergeant at that time --
24 A Correct.
25 Q -- that this man had sustained injuries during this --

Page 16:

1    this arrest?
2 A Yes.
3 Q Meaning Mr. Hill --
4 A Yes.
5 Q -- had sustained injuries?
6 A Yes.
7 Q And you didn't -- did you say something about
8    contacting the township supervisor about that incident,
9    as well?
10 A Yes.
11 Q What did you do and when, as far as the township
12    supervisor?
13 A As soon as I knew about it, I know I contacted Mr.
14    Boogren because I always kept him informed. He wanted
15    to know what was going on. And I advised him as to
16    what I was working on, because there was one other
17    issue with another township employee that I was
18    involved with, and so he was being kept informed of
19    what was going on. And this was one of them. And I
20    told him, you know, that we may have an issue here, but
21    that I need to investigate it further, and when I know
22    more, I would let him know.
23 Q And did you make that contact with the supervisor of
24    the township before or after giving the direction to
25    Detective Sergeant Kjellin?

Page 17:

| | | |
|---|---|---|
| 1 | | MR. TOUTANT: Objection to relevance. (waived) |
| 2 | A | And I don't know. I don't remember if it was before or |
| 3 | | after. |
| 4 | Q | But it was on the same day that you got that call from |
| 5 | | the undersheriff? |
| 6 | A | I believe -- |
| 7 | | MR. TOUTANT: Object to relevance. (waived) |
| 8 | A | I believe it was because I always tried to keep him |
| 9 | | informed immediately if I could. |
| 10 | Q | Would you expect, in that kind of situation, that you |
| 11 | | would make first an effort to take a look at the report |
| 12 | | that had been prepared by the arresting officer? |
| 13 | A | Yeah, I would look at the report and I would look at |
| 14 | | the body cam. |
| 15 | Q | All right. Did you look at the report? |
| 16 | A | Yes. |
| 17 | Q | Did you look at the -- all right. So you looked at the |
| 18 | | -- you say you looked at the report and you looked at |
| 19 | | the body cam video? |
| 20 | A | Yes. |
| 21 | Q | And was this on the same day that you got the call from |
| 22 | | the undersheriff? |
| 23 | A | I couldn't tell you. |
| 24 | Q | Did you make any request of any other police officer to |
| 25 | | go out and interview either the domestic violence |

Page 18:

| | | |
|---|---|---|
| 1 | | victim or anybody else? |
| 2 | | MR. TOUTANT: Object to the form of the (ruling requested) |
| 3 | | question. |
| 4 | A | I don't think I did but I -- Detective Sergeant Kjellin |
| 5 | | might have, might have talked to Corporal Mills. |
| 6 | Q | And you understand that Stephen Mills went out there |
| 7 | | and interviewed -- |
| 8 | A | I believe so -- |
| 9 | Q | -- Lara again? |
| 10 | A | -- yeah. |
| 11 | Q | All right. And did you look at the report that |
| 12 | | Detective Sergeant, at that time, Kjellin made with |
| 13 | | regard to his reinterview of the victim of domestic |
| 14 | | violence, Vickie Lara? |
| 15 | | MR. TOUTANT: Object to the form of the (ruling requested) |
| 16 | | question. |
| 17 | A | And I don't remember if I did or not because in that |
| 18 | | time frame was when Mr. Boogren wanted to see me about |
| 19 | | my job performance. So I don't know if I had time to |
| 20 | | review that, because it was somewhere in towards the |
| 21 | | latter part of March, 1st of April, somewhere in there |
| 22 | | that we had our discussion, and then I resigned from |
| 23 | | the department. |
| 24 | Q | The review that you claim that you did of the body cam |
| 25 | | video, how many times did you take a look at it? |

Page 19:

| | | |
|---|---|---|
| 1 | | MR. TOUTANT: Object to the form of the (waived) |
| 2 | | question, and argumentative, assumes facts not into |
| 3 | | evidence -- not in evidence. |
| 4 | A | I probably reviewed it two or three times. |
| 5 | Q | And you claim to see on there evidence of knee strikes |
| 6 | | on the back? |
| 7 | A | To what I could see, those knee strikes were to the -- |
| 8 | | possibly the back or the side of the person laying |
| 9 | | down. |
| 10 | Q | When you say the side, where are you talking about, the |
| 11 | | side? |
| 12 | A | The rib area. |
| 13 | Q | The rib area? |
| 14 | A | Yes. |
| 15 | Q | So within the thorax? |
| 16 | A | Yes. |
| 17 | Q | Not the side being below the waist? |
| 18 | A | No. |
| 19 | Q | Your claim is that these knee strikes were applied |
| 20 | | above the waist? |
| 21 | A | From what I could see, it appeared that some of them |
| 22 | | were. |
| 23 | Q | And you claim that you could see that on the body cam |
| 24 | | video? |
| 25 | A | Yes. |

Page 20:

| | | |
|---|---|---|
| 1 | Q | When you were asked to come to see the township |
| 2 | | supervisor about problems and complaints that they had |
| 3 | | with your job performance, this was not one of them, |
| 4 | | was it? |
| 5 | | MR. TOUTANT: Object to relevance, facts not (ruling requested) |
| 6 | | in evidence. |
| 7 | A | I don't know. I really don't know if it was. There |
| 8 | | was -- I have no clue. |
| 9 | Q | You have no clue about what he talked to you about? |
| 10 | A | I do -- |
| 11 | Q | All right. So how -- |
| 12 | A | -- have a clue of some of the things. |
| 13 | Q | How many incidents did he talk to you about? |
| 14 | | MR. TOUTANT: Object to relevance. (ruling requested) |
| 15 | A | Yeah. I don't know. |
| 16 | Q | It is a direct question, sir. How many incidents or |
| 17 | | problems did he talk to you about when he talked to you |
| 18 | | about your job performance? |
| 19 | A | I couldn't give you an exact number. I don't know if |
| 20 | | there was three or four. I don't know. I don't |
| 21 | | remember. It was three years ago. |
| 22 | Q | You don't remember what they were? |
| 23 | A | No. |
| 24 | Q | Was this the first time that you had ever been brought |
| 25 | | in front of a supervisor and asked questions about your |

```
 1     job performance?
 2  A  Yes, absolutely.
 3        MR. TOUTANT:  Object --
 4  BY MR. FOSMIRE:
 5  Q  Wouldn't you think it would stand out in your mind --
 6        THE REPORTER:  I am sorry, wait, stop. I
 7     didn't hear what you said, Mr. Toutant.
 8        MR. TOUTANT:  I said object to relevance.
 9  BY MR. FOSMIRE:
10  Q  Wouldn't you think it would stand out in your mind that
11     somebody would be bringing these things to your
12     attention and asking you questions about them?
13        MR. TOUTANT:  Same objection.
14  A  Actually, three years ago, I don't remember a lot of
15     it, but it was something that I could not believe, to
16     be honest with you. I was taken by surprise.
17  Q  Were you brought in front of a meeting with the
18     township trustees?
19  A  A closed door meeting.
20  Q  So the answer is yes?
21  A  Yes.
22  Q  So other people beside the township supervisor were
23     involved in the discussions with you; correct?
24  A  No. The supervisor was the one that had the
25     discussion. The closed door meeting was strictly for
```

                                21

```
 1     me to go in and I resigned. There was no discussion
 2     about anything other than I resigned.
 3  Q  All right. So whatever it was that was brought to your
 4     attention by the township supervisor was strong enough
 5     that you decided that you needed to get out of town and
 6     quit rather than fight it; correct?
 7        MR. TOUTANT:  Object to form, relevance,
 8     facts not in evidence.
 9  A  Yeah, false allegations, yes.
10  Q  False allegations?
11  A  Yeah.
12  Q  All right. When were you contacted requesting your
13     presence at today's deposition?
14  A  A week or so ago.
15  Q  How were you contacted?
16  A  By phone.
17  Q  By whom?
18  A  Phil.
19  Q  By Mr. Toutant?
20  A  Yeah.
21  Q  He called you?
22  A  Yes.
23  Q  What did he talk to you about?
24  A  About having a deposition in regards to Officer Wonch,
25     and I was the chief there at the time, and I said sure,
```

                                22

```
 1     you know, if you are subpoenaing me, I will be there.
 2  Q  Did you receive a subpoena from him?
 3  A  Yes.
 4  Q  Was it served upon you?
 5  A  Certified mail.
 6  Q  All right. You signed for it?
 7  A  Yes.
 8  Q  Knowing it was coming?
 9  A  Yeah.
10  Q  All right. So you are here under subpoena?
11  A  Yes.
12  Q  But you did talk to him by telephone that day?
13  A  Yes.
14  Q  Did you suggest to him that it was not appropriate for
15     you to be talking to him, as the attorney for the other
16     side?
17  A  We didn't talk about anything other than me showing up
18     for being here. He wanted to make sure who I was, that
19     I was the chief that was in Gaylord, the chief that was
20     at Forsyth. Yep, that was me. And he got my
21     information and was able to send me a subpoena.
22  Q  All right. So he must have known that there was going
23     to be testimony coming from you that was going to be
24     helpful to his case, without even asking you?
25        MR. TOUTANT:  Object to the form of the
```

                                23

```
 1     question, argumentative, relevance, and facts not in
 2     evidence.                                    (waived)
 3  BY MR. FOSMIRE:
 4  Q  You can answer.
 5  A  I have no clue why he would, because I didn't tell him
 6     anything.
 7  Q  How long were you chief of police at Forsyth?
 8  A  Three months.
 9  Q  When did you take the position?
10  A  January 6th or 7th I believe, 2019.
11  Q  And when were you called in to talk to the trustees?
12  A  It was right around the first part of April. I
13     resigned -- I believe it was April 9th or 10th I
14     resigned.
15  Q  How many officers were in the department at that time?
16  A  Seven or eight, if I remember right.
17  Q  Were you in the department and police chief when
18     Officer Zach Burch was on duty?
19  A  I don't remember if I was there when he worked there or
20     if he was on duty. I don't remember.
21  Q  I want to maybe --
22        MR. TOUTANT:  Object to relevance.
23  Q  I want to maybe rephrase my question. At the time that
24     you were chief of police, between January and April of
25     2019 --
```

                                24

Page 25:

1 A ~~Right.~~
2 Q ~~-- was Zach Burch one of the officers that was employed~~
3   ~~by the department?~~
4            ~~MR. TOUTANT:   Object to relevance.~~
5 A ~~I don't remember. I can't remember all of the~~
6   ~~officers' names that were there. I was there a short~~
7   ~~time. I remember Detective Sergeant Kjellin, Sergeant~~
8   ~~Cadwell, Corporal Mills, Wonch and then, like I said, I~~
9   ~~wasn't there that long so maybe -- he could have been~~
10  ~~an officer when I was there. I don't remember.~~
11 Q Are you familiar what is known as the SARNS (phonetic
12   spelling) system in the department?
13 A The report writing system?
14 Q Yes.
15 A Yes.
16 Q And you are aware that that system will disclose when
17   somebody has looked at a report?
18 A Yeah, I believe so.
19 Q And when somebody has added to a report or edited a
20   report?
21 A I believe so, yes.
22 Q And if you looked at that report, there should be
23   evidence in that electronic system that you did;
24   correct?
25 A I don't know if I looked at it on the computer or if it

Page 26:

1   was a typed out report. It might have been a typed out
2   report that I looked at. If it was given to me, it
3   would have been a typed out report probably that I
4   reviewed.
5 Q If there was a typed out report, who would have given
6   it to you?
7 A It would have been maybe in the file to be filed. I
8   would have gone through the reports and reviewed it --
9 Q You say maybe?
10 A -- at the time. Yeah. Like I said, it was three years
11   ago. So if -- when you type up a report, some people
12   print them out. Some departments print them out, put
13   them in a bin where the chief reviews all of the
14   reports, and then the administrative assistant will
15   file them, and I may have reviewed it that way.
16 Q All right. You are telling us today, under oath,
17   telling the jury on this video, that you told Detective
18   Sergeant Kjellin that Mr. Hill had sustained injuries,
19   and that's why you wanted him to go back out and
20   interview Vickie Lara; correct?
21 A Yeah. I think I told him that I had gotten a call from
22   the undersheriff, we had an issue and I wanted him to
23   go back and interview those two, and let me know what
24   he came up with, because then I was going to interview
25   Mr. Hill.

Page 27:

1 Q Okay. Well, that little recitation there didn't
2   include anything about injuries. Did you tell Kjellin
3   that this man had been injured in the course of this
4   arrest?
5 A Yeah, we talked about that.
6            ~~MR. TOUTANT:   Objection, argumentative.~~ (waived)
7 A Yeah. We talked about that, yes. Why wouldn't I tell
8   him? I did tell him he sustained injuries and we had
9   to investigate this, absolutely.
10 Q Did he come back to you and tell you anything about
11   what Vickie Lara had told him about injuries?
12 A Again, I don't remember. He may have. He may have,
13   but I don't remember for sure what we talked about.
14 Q If he came back and told you that there was no mention
15   by her that there had been any injuries sustained,
16   would that surprise you?
17 A That she received no injuries?
18 Q No, I am saying any injuries by Mr. Hill.
19 A Oh. That she said that? It may have surprised me or
20   -- I am not sure, but -- because I know he was injured.
21   You know, I already heard he was injured. So I guess
22   if she had told him that she wasn't aware of any
23   injuries, maybe she wasn't. You know, maybe she
24   wasn't.
25 Q ~~Have you since April of 2019 had any conversation with~~

Page 28:

1   ~~Zach Burch?~~
2 A ~~No, no.~~
3 Q Have you since April 2019 had any conversation with any
4   other officer with the Forsyth Police Department?
5 A No.
6 Q When you say that you advised the township supervisor,
7   Mr. Boogren, how did you contact him?
8 A It might have been by phone. I may have called him to
9   let him know what was going on.
10 Q Did you speak with him directly or speak to his
11   assistant?
12 A Oh, I spoke with him directly.
13 Q All right. Have you looked at the body cam video since
14   April 2019?
15 A Yes.
16 Q Under what circumstances have you done that?
17 A Through email.
18 Q Through email. You don't really review body cam video
19   by email. Explain to me how you got a chance to review
20   the body cam video?
21 A I was sent a copy of it.
22 Q By whom?
23 A By Phil.
24 Q When?
25 A Last week, for me to review.

| | | |
|---|---|---|
| 1 | Q | He sent it to you by email? |
| 2 | A | Yes. |
| 3 | | MR. FOSMIRE:  Okay.  Those are all of the |
| 4 | | questions I have. |
| 5 | | MR. TOUTANT:  All right.  I have got some |
| 6 | | follow-up questions, predictably. |
| 7 | | THE WITNESS:  Okay. |
| 8 | | RE-EXAMINATION |
| 9 | BY MR. TOUTANT: | |
| 10 | Q | First off, Mr. Fosmire asked you about how I contacted |
| 11 | | you.  Did I attempt to influence your testimony at all? |
| 12 | A | No. |
| 13 | Q | Did I even attempt to discuss the incident with you? |
| 14 | A | No. |
| 15 | Q | Did I tell you I wanted to discuss it with you on the |
| 16 | | record, and your testimony would be what it was? |
| 17 | A | Yes. |
| 18 | Q | Okay.  And I did email you the body cam video for you |
| 19 | | to review -- |
| 20 | A | Yes. |
| 21 | Q | -- correct? |
| 22 | A | Yes. |
| 23 | Q | And that was -- how long ago was this, three years? |
| 24 | A | The incident, yeah, it was three years ago. |
| 25 | Q | Okay.  And when you were the chief, you had the body |

29

| | | |
|---|---|---|
| 1 | | cam videos and the reports available for your review; |
| 2 | | is that accurate? |
| 3 | A | Yes. |
| 4 | Q | Okay.  So at that time you had those materials? |
| 5 | A | Yes. |
| 6 | Q | Okay.  Based on those materials, did you find that the |
| 7 | | knee strikes Officer Wonch applied were inappropriate? |
| 8 | | ~~MR. FOSMIRE:   Objection, repetitive.~~ (waived) |
| 9 | | ~~Objection to the lack of foundation and to the form of~~ |
| 10 | | ~~the question.~~ |
| 11 | | MR. TOUTANT:  You can answer. |
| 12 | A | Oh, I am sorry.  Yeah, from what I -- from what I |
| 13 | | observed, it appeared that some of those knee strikes |
| 14 | | very well could have been inappropriate. |
| 15 | | MR. TOUTANT:  Okay.  That's all of the |
| 16 | | questions I have. |
| 17 | | MR. FOSMIRE:  We are done.  Thank you. |
| 18 | | THE VIDEOGRAPHER:  Okay.  Let me go off the |
| 19 | | record here.  We are going off the record at the end of |
| 20 | | disk one of the video deposition of Joe Fitzgerald, and |
| 21 | | the time is 1:02 p.m. [sic]. |
| 22 | | * * * * * |
| 23 | | (The deposition was adjourned at 1:08 p.m.) |
| 24 | | |
| 25 | | |

30

| | |
|---|---|
| 1 | STATE OF MICHIGAN       ) |
| 2 | COUNTY OF MARQUETTE     ) |
| 3 | I certify that this transcript, consisting of 31 pages, |
| 4 | is a complete, true, and correct record of the testimony of |
| 5 | JOSEPH FITZGERALD, held in this case on April 20, 2022. |
| 6 | I also certify that prior to taking this deposition |
| 7 | JOSEPH FITZGERALD was duly sworn to tell the truth. |
| 8 | |
| 9 | |
| 10 | _____ |
| | Date        Sandra A. Larson, CSR-2916, RMR |
| 11 |             Northern Reporters |
| |             P.O. Box 27 |
| 12 |             Marquette, MI  49855 |

31